**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

Matthew DeRocha

                    Plaintiff,

      v.

Town of Camillus Police Department
and Police involved

                 Defendants.

5:26-CV-698
(MAD/MJK)

---

Matthew DeRocha, Plaintiff *pro se*

Mitchell J. Katz, U.S. Magistrate Judge

To The Honorable Mae A. D'Agostino, U.S. District Judge

## ORDER AND REPORT-RECOMMENDATION

DeRocha commenced this action on April 10, 2026, by filing a Complaint. ("Compl.," Dkt. 1). DeRocha also filed a motion for leave to proceed *in forma pauperis* ("*IFP*"). (Dkt. 2). The Clerk sent the Complaint and *IFP* application to the Court for review.

## I.    *IFP* APPLICATION

DeRocha declares in his *IFP* application that he is unable to pay the filing fee. (Dkt. 2). After reviewing the *IFP* application, this Court finds that DeRocha is financially eligible for *IFP* status.

## II.    STANDARD OF REVIEW

In addition to determining whether DeRocha meets the financial criteria to proceed *IFP,* courts must consider the sufficiency of the allegations set forth in the complaint. *See* 28 U.S.C. § 1915 (e)(2)(B)(i)-(iii). Courts shall dismiss a case, at any time, if they determine that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *Id.*

When determining whether an action is frivolous, a court must consider whether the complaint lacks an arguable basis in law or in fact. *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also* 28 U.S.C. § 1915. Dismissal of frivolous actions is appropriate to prevent abuses of court process and discourage the waste of judicial resources. *See Neitzke*, 490 U.S. at 327; *see also Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974). Courts have a duty to show liberality toward *pro se* litigants and must use extreme caution when ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond. *See Fitzgerald v.*

*First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000). But courts must still determine that a claim is not frivolous before permitting a plaintiff to proceed. *See Id.* (finding that a district court may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

Additionally, Fed. R. Civ. P. 8(a)(2) requires pleadings to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 does not require detailed factual allegations, it does "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Houston v. Collerman*, No. 9:16-CV-1009 (BKS/ATB), 2016 WL 6267968, at *2 (N.D.N.Y. Oct. 26, 2016) (quoting *Ashcroft*, 556 U.S. at 678). A pleading that contains allegations

3

that "'are so vague as to fail to give the defendants adequate notice of the claims against them' is subject to dismissal." *Id.* (citing *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009)).

The Court will now consider DeRocha's Complaint under the above standards.

## III.   FACTS

DeRocha alleges that "he was arrested on 2/01/2024 for criminal contempt 3rd by the Camillus police" and that the "charge is still pending before Judge Matthew Dotzler in the town of Camillus court." (Dkt. 1, pg. 2).

## IV.   DISCUSSION

The Court recommends: (1) dismissal of the Complaint *with prejudice and without leave to amend* as to the Town of Camillus Police Department, (2) dismissal of the Complaint *without prejudice and with leave to amend* to the extent the Complaint is construed as asserting a claim against the Town of Camillus, (3) dismissal of the Complaint under Fed. R. Civ. P. 8 *without prejudice and with leave to amend* because the Complaint does not afford the Town of Camillus or the "police involved" fair notice of the claim being asserted against them.

### A.    DeRocha's claim against the Town of Camillus Police Department should be dismissed.

The Court recommends dismissal of the Complaint against the Town of Camillus Police Department *with prejudice and without leave to amend* because the police department cannot be sued as an entity separate from the Town of Camillus. "[I]t is well-settled that an administrative arm of a municipality, such as the Police Department . . . , cannot sue or be sued because it does not exist separate and apart from the municipality and does not have its own legal identity." *Riley v. Taylor*, No. 19-CV-1451 (BKS/ATB), 2019 WL 6829046, at *6 (N.D.N.Y. Dec. 13, 2019) (citing *Leland v. Moran*, 100 F. Supp. 2d 140, 145 (N.D.N.Y. 2000)). Because DeRocha cannot sue the Town of Camillus Police Department independently of the Town of Camillus, the Court recommends *dismissal with prejudice and without leave to amend.*

To the extent the Court interprets DeRocha's Complaint as one against the Town of Camillus, it still fails to state a claim. "[A] municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell v. Department of*

5

*Social Services*, 436 U.S. 658, 690-91 (1978). A plaintiff establishes the existence of a policy or custom by showing: "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Kurtz v. Hansell*, No. 20-CV-3401, 2021 WL 1143619, at *18 (S.D.N.Y. Mar. 24, 2021) (quoting Brandon v. City of New York, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)). Here, the Complaint lacks any allegations beyond the fact of DeRocha's February 1, 2024 arrest, so the Court cannot tell whether the Complaint plausibly alleges that DeRocha has been deprived of a constitutional right. Similarly, the Court cannot determine whether the Complaint plausibly alleges that the Town of Camillus has a policy, custom, or practice that caused the purported deprivation of a constitutional right. The Court

6

therefore recommends dismissal of the Complaint against the Town of Camillus *without prejudice and with leave to amend.*

### B. Fed. R. Civ. P. 8

Even if the District Court rejects this Court's recommendation as to the Town of Camillus Police Department and/or the Town of Camillus, the District Court should still dismiss the Complaint *without prejudice and with leave to amend.* Pleadings must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief …" Fed. R. Civ. P. 8(a)(2). "The purpose of [Rule 8] is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Flores v. Graphtex*, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (internal quotations and citations omitted). Rule 8 also requires pleadings to include "a short and plain statement of the grounds for the court's jurisdiction" and "a demand for the relief sought[.]" Fed. R. Civ. P. 8(a)(1), (3). "Although 'no technical form is required,' the Federal Rules make clear that each allegation contained in the pleading 'must be simple, concise, and direct.'" *Cole v. Smrtic*, No. 1:24-CV-847, 2024

7

WL 4870495 (MAD/CFH), at *2 (N.D.N.Y. 2024) (quoting Fed. R. Civ. P. 8(d)). Accordingly, allegations "so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009) (summary order). Although Rule 8 does not require detailed factual allegations, it does "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Houston v. Collerman*, No. 9:16-CV-1009 (BKS/ATB), 2016 WL 6267968, at *2 (N.D.N.Y. Oct. 26, 2016) (quoting *Ashcroft*, 556 U.S. at 678). Here the Complaint fails to allege what, if any, harm DeRocha suffered, what his purported damages are, what relief he is seeking and against whom. Significantly, the Complaint also fails to identify who the "police involved are." In other words, the Complaint does not afford any potential defendant "fair notice of the claim being asserted" against them. *See Graphtex*, 189 F.R.D. at 55. Because the Complaint violates Fed. R. Civ. P. 8, the Court recommends dismissal *without prejudice and with leave to amend.*

### C. Opportunity to Amend

The Court recommends that the Complaint be dismissed *without prejudice and with leave to amend except* as to DeRocha's claim against

8

the Town of Camillus Police Department which the Court recommends

be dismissed *with prejudice and without leave to amend.*

Generally, before the court dismisses a *pro se* complaint or any

part of the complaint *sua sponte*, the court should afford a plaintiff the

opportunity to amend at least once; however, leave to re-plead may be

denied where any amendment would be futile. *See Ruffolo v.*

*Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present

when the problem with plaintiff's causes of action is substantive such

that better pleading will not cure it. *See Cuoco v. Moritsugu*, 222 F.3d

99, 112 (2d Cir. 2000) (citation omitted). Here there is no futility

because DeRocha can allege facts that give rise to a claim.

If the District Court permits this action to proceed and DeRocha

amends his pleading, he is reminded of his obligations under Fed. R.

Civ. P. 8  that his amended complaint contain a short and plain

statement showing that he is entitled to relief. DeRocha is also

reminded of his obligations under Fed. R. Civ. P. 10 to specifically

identify all potential defendants in the caption of the action. While the

amended pleading should contain sufficient facts to provide Defendants

9

with notice of the claims against them, it should not contain material that is irrelevant to DeRocha's claims.

## V.    CONCLUSION

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that DeRocha's motion to proceed *in forma pauperis* (Dkt. 2) is **GRANTED**, and it is further

**RECOMMENDED**, that the District Court **DISMISS** the Complaint against the Town of Camillus Police Department **WITH PREJUDICE AND WITHOUT LEAVE TO AMEND**, and it is further

**RECOMMENDED**, that the District Court **DISMISS** the Complaint against the Town of Camillus **WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND**, and it is further

**RECOMMENDED**, that District Court **DISMISS** the Complaint under Fed. R. Civ. P. 8 **WITHOUT PREJUDICE AND WITH LEAVE TO AMEND,** and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on DeRocha by regular mail,[1] and it is further

---

[1] The Clerk shall also provide DeRocha with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**ORDERED,** that while DeRocha may file objections to this Order and Report-Recommendation, he should wait for the District Court to rule on the above Orders and Recommendations before he submits any amended pleading.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: April 21, 2026

_____
Hon. Mitchell J. Katz
U.S. Magistrate Judge

11

2016 WL 6267968

2016 WL 6267968
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Eddie HOUSTON, Plaintiff,
v.
COLLERMAN, et. al., Defendants.

9:16-CV-1009 (BKS/ATB)
|
Signed 10/26/2016

**Attorneys and Law Firms**

EDDIE HOUSTON, 08-A-3122, Mid-State Correctional Facility, P.O. Box 2500, Marcy, New York 13403, Plaintiff, pro se.

**AMENDED DECISION AND ORDER** [1]

[1]    On October 20, 2016, the Court issued a Decision and Order upon initial review of plaintiff's complaint. Dkt. No. 4. This Amended Decision and Order is issued to correct clerical errors in the Conclusion of the Order.

BRENDA K. SANNES, United States District Judge

**I. Introduction**

 **\*1**  The Clerk has sent to the Court for review a civil rights action filed by pro se plaintiff Eddie Houston. Dkt. No. 1 ("Compl."). Plaintiff has not paid the statutory filing fee for this action and seeks leave to proceed in forma pauperis. Dkt. No. 2 ("IFP Application").

**II. IFP Application**

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 W L 5185047, at \*1 (S.D.N.Y. Oct. 26, 2010). Upon review of plaintiff's IFP Application, the Court finds that plaintiff has demonstrated sufficient economic need and filed the inmate authorization form required in the Northern District of New York. Plaintiff's IFP application (Dkt. No. 2) is granted. [2]

[2]    Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). Based upon the Court's review of plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it does not appear that plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g).

**III. Initial Screening**

Having found that plaintiff meets the financial criteria for commencing this action in forma pauperis, and because plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. §§ 1915(e) and 1915A. Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed in forma pauperis, "the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

[3]    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (noting that Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

 **\*2**  Additionally, when reviewing a complaint, the Court may also look to the Federal Rules of Civil Procedure. Rule 8 of

2016 WL 6267968

the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Hudson v. Artuz,* No. 95 CIV. 4768, 1998 WL 832708, at \*1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank,* No. 95-CV-0063 (TJM), 162 F.R.D. 15, 16 (N.D.N.Y. June 23, 1995) (other citations omitted)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown,* 335 Fed.Appx. 102, 104 (2d Cir. 2009).

### IV. Summary of the Complaint [4]

[4]    Plaintiff annexed exhibits to the complaint. Dkt. No. 1-1. To the extent that the exhibits are relevant to the incidents described in the complaint, the Court will consider the complaint as well as any documents attached as exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.,* 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted); *see also Myers v. Wollowitz,* No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at \*2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). The Court will construe the allegations in plaintiff's complaint with the utmost leniency. *See*, *e.g.*, *Haines v. Kerner,* 404 U.S. 519, 521 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

**\*3** Plaintiff, an inmate currently being held at Mid-State Correctional Facility ("Mid-State C.F."), asserts claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). The incidents that form the foundation for this complaint occurred while plaintiff was confined at Elmira Correctional Facility ("Elmira C.F."). *See* Compl., *generally.* On July 13, 2013, plaintiff filed a grievance claiming that defendants Officer Copestick ("Copestick") and Officer Schieber ("Schieber") harassed him, on more than one occasion, about his medication. *See id.* at 6; *see* Dkt. No. 1-1 at 3-5. On August 5, 2013, after an investigation into the allegations, the Superintendent of Elmira C.F. denied plaintiff's grievance. *See* Dkt. No. 1-1 at 5.

On September 30, 2013, plaintiff was on his way to the masjid to participate in Ramadan when he was stopped by Copestick and Schieber and directed to the wall for a pat-frisk. *See* Compl. at 5. While plaintiff's hands were on the wall, Schieber "violently kicked" his legs from underneath him. *See id.* Schieber "stomped" on plaintiff's ankles while Copestick attempted to choke plaintiff. *See id.* During the assault, the officers yelled racial slurs. *See id.* Defendant Sergeant Collerman ("Collerman") watched the officers beat plaintiff. *See* Compl. at 5. As a result of the attack, plaintiff's eyeglasses were broken, his ankle was swollen, and he could not walk. *See id.* at 5, 9.

At approximately 5:00 p.m., plaintiff received medical treatment for complaints of pain in his right big toe and swelling in his right foot. *See* Dkt. No. 1-1 at 19. Plaintiff

Case 5:26-cv-00698-MAD-MJK     Document 5     Filed 04/21/26     Page 14 of 72
Houston v. Collerman, Not Reported in Fed. Supp. (2016)
2016 WL 6267968

received Motrin and was advised to follow with sick call requests, if needed. *See id.* A "use of force/inmate injury" report was compiled.[5] *See id.* At approximately 7:15 p.m., plaintiff, a diabetic, told a medical provider that he had not received his daily "medication." *See id.* The provider ordered various medications to be delivered to plaintiff on a daily basis. *See id.*

[5]     The Use of Force report was not annexed as an exhibit to the complaint.

On October 1, 2013, plaintiff received a misbehavior report charging him with assault on staff and with refusing a direct order and search.[6] *See* Compl. at 5. On the same day, plaintiff was placed in confinement in the Special Housing Unit ("SHU"). *See* Dkt. No. 1-1 at 19. On October 3, 2013, plaintiff attended a Hearing regarding the misbehavior report.[7] *See* Dkt. No. 1-1 at 10. On November 3, 2013, plaintiff received a copy of the hearing disposition dismissing all charges. *See* Dkt. No. 1-1 at 11; Dkt. No. 1 at 5.

[6]     The name of the officer who served the misbehavior report is not clearly legible on the Hearing Disposition annexed as an exhibit. *See* Dkt. No. 1-1 at 10. Plaintiff does not allege that Copestick, Schieber, or Collerman delivered the report. The disposition form indicates that the charges were reported by Schieber. *Id.* The misbehavior report was not annexed as an exhibit to the complaint.

[7]     The officer who presided over the hearing was a Captain at Elmira C.F. However, the name of the hearing officer is not clearly legible. *See* Dkt. No. 1-1 at 10-11.

On November 3, 2013, plaintiff was released from the SHU. *See* Compl. at 5. While plaintiff was in the SHU, he was unable to participate in Ramadan, denied religious meals, denied parole, and excluded from mental health programs. *See id.*

Construed liberally, the complaint contains the following claims: (1) Copestick and Schieber violated plaintiff's Eighth Amendment rights with use of excessive force (Fifth, Fifteenth, Twentieth, and Twenty-Second Causes of Action); (2) Collerman failed to protect plaintiff from the assault in violation of plaintiff's Eighth Amendment rights (Fifteenth Cause of Action); (3) defendants were deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment (Sixth, Seventh, and Fifteenth Causes of Action); (4) Copestick and Schieber retaliated against plaintiff in violation of plaintiff's First Amendment rights (Twenty-First Cause of Action); (5) plaintiff's First Amendment rights to religious freedom were violated (Fourth Cause of Action); (6) plaintiff's Fourteenth Amendment rights to due process and equal protection were violated (First, Second, Third, Sixth, Sixteenth, and Eighteenth Causes of Action); (7) defendants failed to investigate plaintiff's complaints and follow grievance procedures (Tenth and Thirteenth Causes of Action); (8) perjury claims against officers who filed the misbehavior report (Eleventh and Seventeenth Causes of Action); and (9) supervisory claims against DOCCS (Eighth, Ninth, Twelfth, Fourteenth, Nineteenth, Twenty-Third, Twenty-Fourth, Twenty-Fifth, and Twenty Sixth Causes of Action). *See* Compl., *generally.* Plaintiff seeks compensatory damages, injunctive relief, and criminal charges against defendants (Eleventh and Seventeenth Causes of Action). *See* Compl. at 9-13.

## V. Analysis

### A. Eleventh Amendment

**\*4** The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer,* 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through 42 U.S.C. § 1983, *see Quern v. Jordan,* 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York,* No. 93-CV-1298 (RSP/GJD), 1996 W L 156764 at \*2 (N.D.N.Y. 1996).

Here, insofar as plaintiff seeks an award of money damages pursuant to Section 1983 against DOCCS, those claims are

Case 5:26-cv-00698-MAD-MJK    Document 5    Filed 04/21/26    Page 15 of 72

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

dismissed as plaintiff seeks relief from a defendant immune from suit under section 1983. *See LeGrand v. Evan*, 702 F.2d 415, 417 (2d Cir. 1983); *see Meehan v. Kenville*, 555 Fed.Appx. 116 (2d Cir. 2014); *see Simmons v. Gowanda Corr. Facility*, No. 13-CV-0647, 2013 WL 3340646, at *1 (W.D.N.Y. July 1, 2013) ("the New York State Department of Corrections and [the named correctional facility] enjoy the same Eleventh Amendment immunity from suit in federal court as enjoyed by the state itself") (quoting *Posr. v. Court Officer Shield No. 207*, 180 F.3d 409, 411 (2d Cir. 1999)).

### B. Eighth Amendment

### 1. Excessive Force Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases —not whether a certain quantum of injury was sustained."). "Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness." *Wynter v. Ramey*, No. 11-CV-0257 (DNH/DEP), 2013 W L 5465343, at *5 (N.D.N.Y. Sept. 30, 2013) (citations omitted).

Plaintiff has identified the time, location and individuals involved in the alleged assault. Thus, the Court finds that plaintiff's Eighth Amendment excessive force claims against Copestick and Schieber survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Failure To Intervene

**\*5** The failure of corrections officers to employ reasonable measures to protect an inmate from violence by others may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985). Moreover, allegations that an officer failed to intervene and prevent assaults are sufficient to state an Eighth Amendment failure to protect claim. *See Rogers v. Artus*, No. 13-CV-21, 2013 WL 5175570, at *3 (W.D.N.Y. Sept. 11, 2013). To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: 1) possessed actual knowledge of the use by another of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). In order to succeed on a claim of failure to protect, the inmate "must establish both that a substantial risk to his safety actually existed and that the offending [defendant] knew of and consciously disregarded that risk." *See Walsh v. Goord*, No. 07-CV-0246, 2007 WL 1572146, at *9 (W.D.N.Y. May 23, 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1970)). In addition, a failure-to-protect claim requires a showing that prison officials acted with "deliberate indifference" to the inmate's safety. *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988).

At this early stage of the proceeding, plaintiff has alleged enough to require a response from Collerman to plaintiff's claim that he failed to protect plaintiff from the assault by Copestick and Schieber. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 3. Deliberate Indifference to Serious Medical Needs

To state an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component of an Eighth Amendment deliberate indifference

medical claim "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted). Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F. 3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To assert a claim for deliberate indifference, an inmate must allege that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate must also demonstrate that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06.

In this instance, even assuming plaintiff's injuries were sufficiently serious, plaintiff must allege facts to demonstrate that defendants acted with a sufficiently culpable state of mind. *See Hathaway*, 99 F.3d at 553. Plaintiff claims that his medical treatment was inadequate because his ankle was not x-rayed until he was transferred to "his next facility," two months after the alleged incident. *See* Compl. at 10. "When the basis of a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702). "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata*

*v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (internal citations omitted).

**\*6** Here, the complaint is void of any facts establishing that any defendant deliberately delayed plaintiff's medical treatment. On the day of the alleged attack, plaintiff received medical attention and prescription medication. *See* Dkt. No. 1-1 at 19. Plaintiff was treated on three other occasions in October 2013 for foot pain before undergoing x-rays on November 14, 2013. Dkt. No. 1-1 at 20-21. During those visits, plaintiff received ice packs, Motrin, and refused Ibuprofen. See id. Plaintiff does not allege that his condition deteriorated during that time. *See Rodriguez v. City of New York*, 802 F.Supp. 477, 482 (S.D.N.Y. 2011) (finding that the plaintiff did not establish that his condition worsened as a result of a delay between his request and receipt of medical attention). Plaintiff does not allege that he sought and was refused medical treatment during this two month time period. *See Kee v. Hasty*, No. 01 Civ. 2123, 2004 W L 807071, at \*29 (S.D.N.Y. April 14, 2004) (holding that the plaintiff's Eighth Amendment claims were overly conclusory because the inmate failed to specify the dates on which he was denied proper treatment, the nature of his needs on those dates, and the nature of the treatment that was purportedly denied by the defendants). The complaint lacks any facts to plausibly suggest that any defendant knew of the severity of plaintiff's injury and the risk posed by any delay in his treatment.

Plaintiff, a diabetic, also claims that he was unable to read or see for over one year because his eye glasses were not replaced until over a year after the assault. *See* Compl. at 10. The complaint does not contain any facts suggesting that plaintiff made any complaints or sick call requests to any defendant related to his eyeglasses. Plaintiff also failed to assert facts suggesting that he made any defendant "aware of the serious harm could occur" if he was not provided with his glasses. *See Myrie v. Calvo/Calvoba*, 591 F.Supp.2d 620, 628 (S.D.N.Y. 2008) (holding that the complaint did not suggest that any defendant was deliberately indifferent to the plaintiff's vision problems).

Plaintiff's Eighth Amendment allegations are also subject to dismissal based upon the failure to plead personal involvement on the part of any defendant. It is well settled in this Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a Section 1983

Case 5:26-cv-00698-MAD-MJK    Document 5    Filed 04/21/26    Page 17 of 72

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 W L 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). The complaint lacks any facts suggesting that Copestick, Schieber, or Collerman were involved in plaintiff's medical treatment or refused to allow plaintiff to receive medical attention. In the absence of factual allegations sufficient to plausibly suggest that any defendant was personally involved, the complaint fails to state a cognizable claim against him. Consequently, plaintiff's Eighth Amendment claims for deliberate indifference to plaintiff's medical needs are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim.

### C. First Amendment

#### 1. Retaliation

Plaintiff alleges that Copestick and Schieber assaulted him in retaliation for plaintiff's grievance against them. *See* Compl. at 6,13. To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff – namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)). The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dawes*, 239 F.3d at 491, *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988).

**\*7** It is well-settled that filing a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). While there is no "bright line" defining the limits of the temporal relationship, courts in the Circuit have held that an adverse action taken within three months after a protected activity can reasonably be perceived as retaliatory. *See Gorman-Bakos v. Cornell Coop. Extn. of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001); *see also Ashok v. Barnhart*, No. 01-CV-1311, 289 F.Supp.2d 305, 314 (E.D.N.Y. Oct. 30, 2003) (the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months).

At this juncture, the Court finds that plaintiff's retaliation claims against Copestick and Schieber survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

#### 2. Religious Claims

Plaintiff alleges that the defendants violated his religious rights because he was unable to participate in Ramadan and denied his religious meals as a direct result of the false misbehavior report. Dkt. No. 1 at 5-6.

Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (citing *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). To state a First Amendment Free Exercise claim, a plaintiff must allege that (1) the practice asserted is religious in the person's scheme of beliefs, and that the belief is sincerely held; (2) the challenged practice of the prison officials infringes upon the religious belief; and (3) the challenged practice of the prison officials furthers some legitimate penological objective. *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir.

Case 5:26-cv-00698-MAD-MJK    Document 5    Filed 04/21/26    Page 18 of 72

Houston v. Collerman, Not Reported in Fed. Supp. (2016)
2016 WL 6267968

1988) (citations omitted). A prisoner "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) (citing *Ford*, 352 F.3d at 591).[8] A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature. *Ford*, 352 F.3d at 590. A prisoner's sincerely held religious belief is "substantially burdened" where "the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 476–77 (2d Cir. 1996). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595) (punctuation omitted).

8        The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith*, 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford*, 352 F.3d at 592 (quoting *Emp't Div.*, 494 U.S. at 887); *see also Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. May 6, 2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs."); *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

**\*8** In this case, plaintiff has not alleged who issued the misbehavior report and it is not attached to the complaint. An inmate "has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997). While a false misbehavior report may give rise to a claim under § 1983 "when done in retaliation for the exercise of a

constitutional right," *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015), here there is no such allegation. While the deprivation of religious meals in SHU may be sufficient to state a claim, *see Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. 2016); *Skates v. Shusda*, No. 9:14-CV-1092 (TJM/ DEP), 2016 WL 3882530, at \*\*4-5 (N.D.N.Y. May 31, 2016), here there is no indication that the defendants had any personal involvement in that conduct. The allegations, without more, fail to plausibly suggest that any defendant burdened plaintiff's right to freely practice his religion. Thus, plaintiff's First Amendment claims against are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### D. Fourteenth Amendment

#### 1. Equal Protection/Discrimination

Plaintiff claims that the September 30, 2013 assault was racially motivated. *See* Compl. at 6, 12. "When verbal harassment and simultaneous physical abuse ... are considered together, [courts] have little doubt concluding that plaintiff's allegations [are] sufficient to state a § 1983 claim for discrimination on the basis of race. *Cole v. Fischer*, 379 Fed.Appx. 40, 43 (2d Cir. 2010). "Under the Fourteenth Amendment's Equal Protection clause, a plaintiff may be able to recover for a physical assault that would not meet the objective threshold for Eighth Amendment excessive force claims, if the defendant's conduct was motivated by racial or religious discrimination." *Bhuiyan v. Wright*, No. 9:06-CV-409 ATB, 2011 WL 1870235, at \*9 (N.D.N.Y. May 13, 2011) (citation omitted).

At this juncture, plaintiff has sufficiently plead a Fourteenth Amendment equal protection claim to warrant a response from Copestick and Schieber. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

#### 2. Due Process

Plaintiff claims that defendants violated his due process rights when they failed to replace plaintiff's eyeglasses. *See* Compl. at 10. Plaintiff also asserts that his Fourteenth Amendment rights were violated because he was improperly confined to the SHU without a hearing as a result of a

false misbehavior report. *See id.* at 10. During his SHU confinement, was allegedly unable to participate in Ramadan, denied his religious meals, denied parole, and excluded from mental health programs. *See id.*

### a. Property Claim

The Supreme Court has held that the negligent or intentional deprivation of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer,* 468 U.S. 517, 531 (1984) (citing *Parratt v. Taylor,* 451 U.S. 527, 541 (1981)); *Davis v. New York,* 311 Fed.Appx. 397, 400 (2d Cir. 2009) (An alleged loss of property, "whether intentional or negligent – will not support a due process claim redressable under § 1983 if 'adequate state post-deprivation remedies are available.' ") (quoting *Hudson,* 468 U.S. 533). "New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia*, a Court of Claims action." *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir. 2001). Because plaintiff has access to adequate state law remedies, he has not been deprived of property without due process of law and therefore cannot state a claim for relief pursuant to Section 1983. *See Love v. Coughlin,* 714 F.2d 207, 208-09 (2d Cir. 1983) (per curiam); *see also Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 360, 473-74 (S.D.N.Y. 1998) (dismissing the plaintiff's claim that defendants destroyed his eyeglasses in violation of his due process rights). Thus, plaintiff's due process claims related to his eyeglasses are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### b. SHU Confinement

**\*9** To establish a due process claim, plaintiff must establish: "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir. 2001) (citation and internal quotation marks omitted). In this case plaintiff alleges that the false misbehavior report resulted in a SHU sentence.[9]

[9]  The complaint contains conflicting factual allegations related to the length of plaintiff's SHU confinement. Plaintiff claims that after "one month of being housed in SHU," he was released. *See*

Compl. at 5. In the Third Cause of Action, plaintiff claims that he served "over 60 days in SHU." *See id.* at 9.

A prisoner "has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *J.S. v. T'Kach,* 714 F.3d 99, 106 (2d Cir. 2013) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, (1995)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir. 2004). In making this determination courts are to consider, "among other things, the duration and conditions of confinement." *J.S.,* 714 F.3d at 106; *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir. 2009). The conditions of confinement are to be considered "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis,* 576 F.3d at 134; *Palmer,* 364 F.3d at 66 n.4.

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer,* 364 F.3d at 65. Where the plaintiff is confined for "an intermediate duration –between 101 and 305 days – 'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required.' " *Id.* (quoting *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir. 2000)). While confinements for less than 101 days "under normal SHU conditions may not implicate a prisoner's liberty interest," such confinements "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealy* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 65; *see Davis,* 576 F.3d at 133.[10]

[10]  The Second Circuit has noted that "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short –less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer,* 364 F.3d at 65-66; *see Davis,* 576 F.3d at 133. Absent allegations in the complaint that the conditions of confinement were in some way

atypical, however, many courts in this Circuit have granted motions to dismiss claims by plaintiffs with confinement exceeding thirty days when the plaintiffs failed to allege that the conditions of confinement were in some way atypical. *See, e.g., Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470 at *15 (S.D.N.Y. Sept. 29, 2014) (citing cases involving confinements of between forty and fifty days which were dismissed for failure to allege a protected liberty interest because there were no allegations of unusual confinement).

**\*10** In this case, the duration of the confinement, 30 to 60 days, "was not long enough to constitute an atypical and significant deprivation by itself," and the Court therefore must "look to the conditions of confinement." *Palmer*, 364 F.3d at 66; *see also Davis*, 576 F.3d at 133. Plaintiff claims that while he was confined in the SHU, he was unable to participate in Ramadan, denied his religious meals, denied parole, and excluded from his mental health program. *See* Compl. at 5, 10; Dkt. No. 1-1 at 1.

It is well established that prisoners do not have a constitutional right to parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). "Where a state has created a statutory scheme for parole, the Due Process Clause protects prisoners insofar as they 'have a legitimate expectancy of release that is grounded in the state's statutory scheme.' " *Barna v. Travis*, 239 F.3d 169, 170–72 (2d Cir. 2001) (per curiam) (citing *Greenholtz*, 442 U.S. at 11–13). "New York's parole scheme is not one that creates in any prisoner a legitimate expectancy of release." *Barna*, 239 F.3d at 171. Plaintiff has also failed to plead that his inability to participate in mental health programs impacted a protected liberty interest. *See Nieves v. Prack*, No. 6:15-CV-6101, 2016 W L 1165820, at *4 (W.D.N.Y. March 24, 2016) ("[Plaintiff's] claim that his inability ... to participate in various educational, vocational, rehabilitative or self-help programs might have hindered his ability to receive an early parole or release is ... speculative and fails to allege interference with a protected liberty interest.") (citations omitted). Here, the complaint lacks facts establishing when, how many times, and who deprived plaintiff of the right to attend his mental health program. With respect to plaintiff's religious claims, courts have found that the deprivation of communal religious services does not constitute an atypical and significant hardship. *See Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (finding that eighteen days in administrative segregation, including loss of exercise and access to religious services, did not constitute atypical and significant hardship); *Holland v.*

*Goord*, No. 05-CV-6295, 2006 WL 1983382, at *7 (W.D.N.Y. July 13, 2006) (holding the inability to attend Muslim services and celebrate the end of Ramadan while confined in the SHU for seventy-seven days is not an atypical hardship).

Even assuming that plaintiff had pled facts sufficient to show that his confinement imposed an atypical and significant hardship, however, and therefore pled the existence of a valid liberty interest, the complaint fails to state a claim based upon the Fourteenth Amendment and due process. It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). In this case, a hearing regarding the charges was held within two days of plaintiff's receipt of the misbehavior report. Plaintiff does not allege that he was denied any procedural due process during that hearing. Moreover, the complaint lacks facts suggesting that any named defendant issued the misbehavior report or presided over the disciplinary hearings. Based upon the aforementioned, plaintiff's Fourteenth Amendment claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *See Livingston v. Kelly*, 561 F.Supp.2d 329, 332 (W.D.N.Y. 2008) (dismissing plaintiff's false-report claims because the plaintiff failed to allege that the disciplinary hearings on the reports did not meet constitutional due process standards).

### E. Failure to Respond to Grievances and Failure to Investigate

**\*11** Plaintiff also claims that his constitutional rights were violated because the facility grievance program is "never followed." *See* Compl. at 11. There is no constitutional right of access to the established inmate grievance program. *Davis v. Buffardi*, No. 9:01-CV-0285 (PAM/GJD), 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[p]articipation in an inmate grievance process is not a constitutionally protected right"); *Shell v. Brzezniak*, 365 F.Supp.2d 362, 369-70 (W.D.N.Y. 2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim"); *Cancel v. Goord*, No. 00. Civ. 2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"); *Mimms v. Carr*, No. 09-CV-5740, 2011 W L 2360059, at *10 (E.D.N.Y. June 9, 2011) ("It is well-established that

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

prison grievance procedures do not create a due-process-protected liberty interest.") (citing cases). Simply stated, there is no underlying constitutional obligation to afford an inmate meaningful access to the internal grievance procedure, or to investigate and properly determine any such grievance.

To the extent that plaintiff attempts to assert a separate constitutional claim based upon the Inspector General's failure to investigate, the law is also clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Bernstein v. New York*, 591 F.Supp.2d 448, 460 (S.D.N.Y. 2008) (collecting cases); *Torres v. Mazzuca*, 246 F.Supp.2d 334, 341-42 (S.D.N.Y. 2003) (Prisoners do not have a due process right to a thorough investigation of grievances.); *DeShaney v. Winnebego Soc. Servs.*, 489 U.S. 189, 196 (1989) (The Due Process Clause confers no right to governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual); *Pine v. Seally*, No. 9:09-CV-1198, 2011 W L 856426, at *9 (N.D.N.Y. Feb. 4, 2011) ("the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials") (citing *Bernstein*, 591 F.Supp.2d at 460).

In this regard, plaintiff's claims do not involve a constitutional violation and are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

#### F. Cause of Action for Criminal Charges/Perjury

"New York does not recognize a common law cause of action for [...] perjury." *Harris v. Summers*, No. 5:14-CV-0013 (LEK/DEP), 2014 W L 1340032, at *5 (N.D.N.Y. Apr. 3, 2014) (citing *Carvel v. Ross*, No. 12-CV-0722, 2011 W L 856283, at *12 (S.D.N.Y. Feb. 16, 2011) (dismissing the plaintiff's perjury claim because "there [is] no private right of action" for perjury)). Moreover, plaintiff's claim is not actionable because it is well-settled that a private citizen does not have a constitutional right to bring a criminal complaint against another individual. *Harper v. New York Child Welfare Comm'rs*, No. 3:12-CV-0646 (NAM/DEP), 2012 WL 3115975, at *4 (N.D.N.Y. May 14, 2012) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). Consequently, plaintiff's request to charge defendants with "perjury" is dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

#### G. Injunctive Relief Against DOCCS

Plaintiff demands injunctive relief directing DOCCS to require "each officer" to wear body cameras to prevent future assaults and other related injunctive relief. *See* Compl. at 10-12. Plaintiff is presently confined at Mid-State C.F. and therefore, plaintiff's request for injunctive relief involving changes to the operation of security at Elmira C.F., is dismissed as moot. *See Edwards v. Horn*, No. 10 Civ. 6194, 2012 WL 760172, at *23 (S.D.N.Y. March 8, 2012) (dismissing the plaintiff's claim for injunctive relief because the plaintiff had been released from prison).

**\*12** Even assuming plaintiff's request is broader and intended to encompass all DOCCS facilities, the request is nonetheless improper and subject to dismissal. The PLRA provides "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of the particular plaintiff." 18 U.S.C. § 3626(a)(1)(A). "[A] proposed order directing the installation of securities cameras – is beyond the narrow scope permitted by the PLRA." *Barrington v. New York,* 806 F.Supp.2d 730, 750 (S.D.N.Y. 2011) (dismissing the plaintiff's request for injunctive relief seeking an order directing Green Haven to install security cameras as overly broad and unnecessary to correct the alleged past violations of his rights). Accordingly, plaintiff's request for injunctive relief is dismissed.

### VI. Conclusion

**ORDERED** that plaintiff's in forma pauperis application (Dkt. No. 2) is **GRANTED**; [11] and it is further

[11]     Plaintiff should note that, although the Court has granted his application to proceed in forma pauperis, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's authorization form, and notify the official that this action has been filed and that plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk of the Court provide a copy of plaintiff's inmate authorization form to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the following claims are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) plaintiff's § 1983 claims for monetary damages against DOCCS; (2) constitutional claims based upon the failure to adhere to the grievance policy and investigate; and (3) plaintiff's claims related to perjury and filing criminal charges against defendants; and it is further

**ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) Eighth Amendment claims against defendants for deliberate indifference to plaintiff's serious medical needs; (2) First Amendment freedom of religion claims; (3) Fourteenth Amendment due process claims; and (4) claims for injunctive relief against DOCCS [12]; and it is further

[12]   If plaintiff wishes to pursue any claim dismissed without prejudice, he is advised to that, if accepted for filing, any amended complaint will entirely replace the original complaint and incorporation of prior claims is not permitted.

**ORDERED** that DOCCS is **DISMISSED** as a defendant herein; and it is further

**ORDERED** that the following claims survive the Court's sua sponte review under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) and require a response: (1) the Eighth Amendment use of excessive force claims against defendants Copestick and Schieber; (2) the Eighth Amendment failure-to-intervene claim against defendant Collerman; (3) the First Amendment retaliation claims against defendants Copestick and Schieber; and (3) the Fourteenth Amendment equal protection claims against Copestick and Schieber; and it is further

**ORDERED**, that the Clerk shall issue summons and forward them, along with copies of the Complaint, to the United States Marshal for service upon the remaining defendants. The Clerk shall forward a copy of the Summons and Complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

 **\*13  ORDERED**, that a response to the complaint be filed by the remaining defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure;

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED**, in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009), the Clerk of the Court is directed to provide plaintiff with copies of opinions from Westlaw and the Federal Appendix cited in this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

Dated: October 26, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6267968

---

   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:16-CV-01009**<br>Houston v. Collman et al | — | N.D.N.Y. | Aug. 15, 2016 | Docket |

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:26-cv-00698-MAD-MJK    Document 5    Filed 04/21/26    Page 26 of 72

Riley v. Taylor, Not Reported in Fed. Supp. (2019)
2019 WL 6829046

2019 WL 6829046
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Tony RILEY, Plaintiff,
v.
Staci Dennis TAYLOR, Asst. District Attorney; and
Onondaga County Sex Offender Office, Defendants.

5:19-CV-1451 (BKS/ATB)
|
Signed 12/13/2019

**Attorneys and Law Firms**

TONY RILEY, Plaintiff, pro se.

### ORDER and REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

 **\*1** The Clerk sent to the court for review a civil rights complaint, together with a motion to proceed in forma pauperis ("IFP"), filed by plaintiff Tony Riley. (Complaint "Compl.") (Dkt. No. 1, 3). [1] Plaintiff subsequently filed an amended complaint. ("AC") (Dkt. No. 5).

[1]     When plaintiff initially filed this action, he neglected to include his motion for IFP status. Thus, the action was administratively closed pending plaintiff's submission of the appropriate application. (Dkt. No. 2). Plaintiff has now filed a proper motion to proceed IFP (Dkt. No. 3), the case was reopened (Dkt. No. 4), and the court may now conduct its initial review.

### I. IFP Application
As to plaintiff's IFP application, the court finds that plaintiff has demonstrated sufficient economic need, and he has filed the appropriate information. Therefore, plaintiff has met the financial criteria for proceeding IFP.

However, in addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

### II. Complaint and Amended Complaint
Although plaintiff's complaint was confusing, it appeared that he was challenging his current incarceration, which appears to be based upon his failure to comply with sex offender registration requirements. Shortly after filing his original complaint, plaintiff filed an amended complaint, which appears to state the same claims in a slightly different fashion. (AC at pp. 1-5). [2] Plaintiff has also attached a variety of administrative requests that he has made at the Onondaga County Justice Center, together with the administrative responses. (AC at pp. 5-25).

[2]     Plaintiff has not numbered the pages of the amended complaint. Thus, when the court refers to a page number, it is referring to the pagination assigned by the court's electronic filing system, CM/ECF.

**\*2** Rule 15 of the Federal Rules of Civil Procedure provides that a party may amend a pleading once as a matter of course twenty-one (21) days after serving it. Fed. R. Civ. P. 15(a)(1)(A). This plaintiff is proceeding IFP, and the court has not yet ordered service, thus, plaintiff may submit his amended complaint as a matter of course. The court will, therefore, consider plaintiff's amended pleading as the operative pleading in this case. However, the court will read and cite to both complaints in order to determine what plaintiff might be attempting to claim.

In his amended complaint, plaintiff alleges that on April 17, 1999, he was charged with sex abuse, "no investigation [and] no evidence," but he pled guilty to sex abuse and a weapons charge. (AC ¶ 4 - Facts). Plaintiff states that he was sentenced to one year for the sex abuse and one year for the "shotgun" that he had. (*Id.*) As a result of the sex abuse conviction, he was required to register as a sex offender for 10 years. (*Id.*) Plaintiff states that "before [his] sixteen months was over," he was supposed to appear before the sentencing court, but this did not happen. (*Id.*) Plaintiff states "that is why they keep arresting me...." (*Id.*)

Plaintiff's original complaint contained additional details, describing his repeated arrests for failure to register which do not appear in the amended complaint. [3] However, the amended complaint alleges additional facts that were not in the original complaint and names additional defendants who were not in the original complaint.

[3]    In his original complaint, plaintiff stated that his defense attorney and the Judge did not give him a chance to defend himself, and they forced him to plead guilty to sex abuse and a weapons charge, upon which he was sentenced to one year on each charge (Compl. ¶ 4-Facts) (Dkt. No. 1). Plaintiff states that, as a result of the conviction, he was required to register as a sex offender for ten years, beginning January 20, 2000. (*Id.*) Plaintiff states that at the end of "those" sixteen (16) months, he was supposed to go back in front of the sentencing judge, "which never happened." (Compl. ¶ 5, Causes of Action). Plaintiff claims that although he had "completed" the sentence imposed by the trial court judge "after ten years," on March 27, 2009, he was arrested again and told that he had to do "20 years of register [sic]." (*Id.*) (First Cause of Action). Plaintiff then states that "now that I have the 20 years done, I

have been arrested again saying I have to do life of register [sic]." (*Id.*) (Second Cause of Action). Plaintiff states that attorney Nikki Platenik "got in court and stated this case was suppose[ed] to have been droped [sic] and I was release and it was 2 years later." (*Id.*)
Plaintiff states that "I am arrested again on the same charge failure to register with no sentencing minutes no transcrip [sic] and they held me for 10 months and release[d] me." (*Id.*) (Third Cause of Action). It appears that plaintiff alleges that three months later, he was arrested again, held for seven months and then released again. (*Id.*) Plaintiff then states "now here I am 7/25/19 arrested on the same charge failure to register with a very high bail waiting trial." (Id.)

The caption of the amended complaint lists only "defendant" Onondaga County Sex Offender Officer. (AC at p. 1). However, in the "Parties" section of the complaint, plaintiff names new defendant "Sex Offender Officer," [4] original defendant Assistant District Attorney Staci Dennis Taylor, and new defendant Attorney Robert Earl. (AC ¶ 3(a) - 3(c)).

[4]    The original complaint named the Onondaga County Sex Offender Office. (Compl. at 1).

 **\*3** The "Causes of Action" in the amended complaint are not causes of action, but an extension of the Fact section. (AC ¶ 5). Plaintiff alleges that he "tried to tell these people nothing happen [sic] between this young woman and I [sic]." (AC ¶ 5) (First Cause of Action). Plaintiff essentially explains that he was not guilty of the sex abuse charge for which he plead guilty in 1999, and that his attorney [5] "set all this up because the parents had money." (*Id.*) The "Second Cause of Action" contains more of plaintiff's explanation and his problems with the 1999 conviction and subsequent registration requirements. (AC ¶ 5) (Second Cause of Action).

[5]    Plaintiff's attorney from his 1999 charges, Lisa Giles, is not named as a defendant in either complaint.

The "Third Cause of Action" adds new facts which were not in the original complaint. (AC ¶ 5) (Third Cause of Action). In this paragraph, plaintiff states that he had an accident, and now has multiple medical issues, but makes no claims regarding his medical condition. He ends the amended complaint by stating that he is "incarcerated for something he never did." (*Id.*) The attachments to the amended complaint

Riley v. Taylor, Not Reported in Fed. Supp. (2019)
2019 WL 6829046

consist of plaintiff's request for information regarding his criminal case, including sentencing transcripts and sentencing minutes from 1-20-2000. (AC - Attachments at p. 13).

In his prayer for relief, he requests that "this sex offender be remove [sic] because the [sic] sentence me to 10 years 17 years later they told me life statutes of limitations was over on that in 5 years this happen 4-17-99. [6] (AC ¶ 6). Plaintiff is also requesting $350 dollars per day for ten years, nine months, and 27 days. [7]

[6]  Plaintiff's sentences run together without punctuation, but based on the complaint and amended complaint, the court has interpreted this sentence loosely as follows: Plaintiff wishes his sex offender classification and registration requirements "removed," because he was originally required to register for ten years, but seventeen years later, he was told that he had to register for life. Plaintiff claims that the statute of limitations was "over on that in 5 years."

[7]  Plaintiff's original complaint requested that he be released and that he be awarded $15 million dollars. (Compl. ¶ 6).

### III. Jurisdictional Basis

Plaintiff brings this action on a form reserved for cases brought under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Investigation*, 403 U.S. 388 (1971). *Bivens* established a cause of action for monetary damages resulting from the violation of a constitutional right by federal agents or employees, acting under color of *federal* law. *Arar v. Ashcroft*, 585 F.3d 559, 571-72 (2d Cir. 2009) (discussing history of *Bivens* actions).

One of the defendants in this action is an Assistant District Attorney in Onondaga County, and the other defendant is a county/state entity or officer. The final defendant appears to be a court-appointed private attorney. Thus, none of the defendants acts under color of federal law for purposes of *Bivens*. Clearly plaintiff filed both his original and his amended complains on the wrong forms. Because plaintiff is pro se, the court will interpret the complaint as raising claims under whatever basis is appropriate without regard to the form-complaint. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (pro se papers are interpreted liberally to raise the strongest arguments suggested therein).

Section 1983 of Title 42 of the United States Code provides a cause of action for individuals who have had their constitutional or federal rights violated by a defendant acting under color of *state* law. 42 U.S.C. § 1983. Section 1983 is based upon an underlying violation of a constitutional right and does not provide a right of action in itself. *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 2010) ("Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source.")

**\*4** To the extent that plaintiff could bring an action for damages with the facts that he alleges, the only proper basis for jurisdiction would be under section 1983. [8] The court will interpret plaintiff's action to have been brought under section 1983 and will proceed to analyze whether the action may proceed further.

[8]  Plaintiff appears to be familiar with section 1983 because in one of the documents attached to his amended complaint, he states that he is filing a "1983 Bivens." Plaintiff has confused the two actions. (AC Attachment at 4).

### IV. Release from Confinement

#### A. Legal Standards

Plaintiff may only bring a request for release from confinement in a petition for habeas corpus pursuant to 28 U.S.C. § 2254. *McFadden v. Pataki*, No. 17-CV-1048, 2017 WL 4350591, at \*2 (S.D.N.Y. July 7, 2017) (citing *Wilkinson v. Dotson*, 544 U.S. 74, 78-82 (2005)) (citing *Preiser v. Rodriguez*, 411 U.S. 475 (1973) (noting that writ of habeas corpus is sole remedy for prisoner seeking to challenge the fact or duration of his confinement)). Section 2254 requires that the inmate exhaust his state court remedies prior to seeking such relief, and plaintiff may not circumvent this requirement by filing a section 1983 action. *Id.*

#### B. Application

In his original complaint, in addition to damages, plaintiff asked for release from his current confinement. Plaintiff does not make that specific request in the amended complaint, but he does ask that the sex "offender" be "removed," which could result in the plaintiff's release. [9] Release from confinement may not be obtained without the exhaustion of state court remedies under 28 U.S.C. § 2254. In the original complaint, plaintiff stated that he was currently

Case 5:26-cv-00698-MAD-MJK     Document 5     Filed 04/21/26     Page 29 of 72

**Riley v. Taylor, Not Reported in Fed. Supp. (2019)**
2019 WL 6829046

incarcerated and awaiting trial. It, therefore, appears from the face of his complaint that he has not exhausted his state court remedies with respect to any challenges that he might have to his current incarceration.[10] The same is true to the extent that plaintiff might be attempting to challenge his 1999 conviction and its alleged effect on his current situation. The amended complaint contains language which appears to explain plaintiff's innocence of the 1999 sex abuse charges. To the extent that plaintiff may be requesting release from confinement, the claim must be dismissed without prejudice at this time.

9       The court notes that, to the extent that plaintiff is challenging the registration requirement itself, relating to the 1999 conviction, separate from his current incarceration it has been held that sex offender registration requirements are collateral consequences of a criminal conviction. *Rodriguez v. Attorney General*, No. 10 Civ. 3868, 2011 WL 519591, at *5-8 (S.D.N.Y. Feb. 15, 2011) (citations omitted). After the sentence has been served, the collateral consequences alone are insufficient to satisfy the "in custody" requirement of section 2254. *See Fowler v. Fischer*, No. 18 Civ. 2551766, at *2-3 (S.D.N.Y. May 30, 2019) (discussing cases). The court in *Fowler* stated that, although the Second Circuit has not decided this issue, several circuit courts of appeal have determined that the registration requirement alone does not satisfy the "in custody" requirement, making habeas corpus unavailable to the individual. *Id.* at *3-4 (citing cases). In this case, plaintiff's sentence of incarceration ended long ago, and any current registration requirement would not be sufficient to satisfy the "in custody" requirement which would be necessary to challenge the 1999 conviction. In any event, without engaging in a detailed discussion, the one-year statute of limitation to challenge the 1999 conviction would likely have expired long ago. 28 U.S.C. § 2244(d)(1).

10      Although plaintiff may not be aware, or may not understand, the Sex Offender Registration Act ("SORA") in New York State, N.Y. Correct. Law § 168 et seq., was amended in 2006. The New York State Legislature amended sections 168-h and 168-o. *Doe v. Cuomo*, 755 F.3d 105, 108-109 (2d Cir. 2014). The amendment to section 168-h increased the registration requirement for level one offenders

from 10 to 20 years. *Id.* Section 168-o was amended to remove the language allowing a sex offender to petition the court for a modification of the level of notification. *Id.* at 109. In *Doe*, the court rejected constitutional challenges by level one sex offenders to the amendment increasing their registration requirement after their convictions and the imposition of sentence. *Id.* at 109-115. The court rejected an ex post facto challenge, a procedural due process challenge, a substantive due process challenge, an equal protection and Fourth Amendment challenge, and a claim that the increase in registration time violated the plaintiffs' plea agreements. *Id.* Plaintiff pled guilty in 1999, when the registration requirement was 10 years. However, prior to the expiration of those 10 years, the statute was amended to require 20 years of registration. This amendment may be the explanation for plaintiff's claim that his registration requirement was "increased" in 2009, when he should have been completing his requirements. Based on *Doe*, there is no avenue for plaintiff to challenge that increase.

## V. *Heck v. Humphrey*

### A. Legal Standards

**\*5** Civil lawsuits may not be used to collaterally attack criminal convictions. *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held that a section 1983 action seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal habeas court. *Id.* at 486-87.

### B. Application

To the extent that plaintiff seeks money damages and not release from confinement, the amended complaint must also be dismissed. He states that he is awaiting trial on his current charges. Thus, he cannot meet the requirement in *Heck* that his conviction has been reversed or called into question by a federal habeas court. The same is true to the extent that he is somehow attempting to challenge his 1999 conviction or the effect that it may be having on his current incarceration.

## VI. **Prosecutorial Immunity**

### A. Legal Standards

Prosecutors enjoy absolute immunity from suit under section 1983 in matters associated with their prosecutorial functions, regardless of motivation. *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function, including conspiracies to present false evidence); *Bernard v. County of Suffolk*, 356 F.3d 495 (2d Cir. 2004) (absolute immunity shields prosecutors from suit pursuant to section 1983 for their alleged malicious or selective prosecution as well as for any misconduct in the presentation of evidence to the grand jury).

Absolute immunity is defeated only when the prosecutor is engaging in investigative functions. *Bernard v. County of Suffolk*, 356 F.3d at 502-503 (citation omitted). The initiation and pursuit of prosecution, regardless of any alleged illegality, is protected by absolute prosecutorial immunity. *Peay v. Ajello*, 470 F.3d 65, 67-68 (2d Cir. 2006). It has also been held that a prosecutor is entitled to absolute immunity for his or her decision not to prosecute, regardless of the motivation for that decision. *Scloss v. Bouse*, 876 F.2d 287, 292 (2d Cir. 1989).

### B. Application

In both complaints plaintiff has named Assistant District Attorney Staci Dennis as an individual defendant in this action. Although plaintiff has named defendant Dennis in the caption of the complaints, he does not mention her at all in the facts or anywhere else in the body of either complaint. Personal involvement is a prerequisite to liability in a section 1983 action. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In addition to the requirement that any defendant in a section 1983 complaint be "personally involved" in the alleged constitutional violations, as an assistant district attorney, defendant Dennis would be absolutely immune from any damage claim made by plaintiff to the extent that she was performing a prosecutorial function. Since plaintiff has not even mentioned this defendant in the body of the complaint or the amended complaint, the court cannot determine whether she would be entitled to absolute or qualified immunity, but the claim would have to be dismissed in any event based on the lack of alleged personal involvement.

### VII. Municipal Liability

### A. Legal Standards

A municipality may not liable pursuant to section 1983 under the theory of respondeat superior, but may be only liable where its employee acted pursuant to an official policy, custom, or practice. *See Monell v. Dep't of Soc. Serv. of the City of New York*, 436 U.S. 658, 694–95 (1978); *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990). A policy, custom or practice may "be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (internal quotation marks omitted).

### B. Application

**\*6** The court notes that in his original complaint, plaintiff appears to have named the Onondaga County Sex Offender ***Office*** as a defendant. In the amended complaint, he writes "officer." To the extent that plaintiff was attempting to sue the "office," it is well-settled that an administrative arm of a municipality, such as the Police Department or the Onondaga County Sex Offender Office, to the extent that such an "Office" exists, "cannot sue or be sued because it does not exist separate and apart from the municipality and does not have its own legal identity." *Leland v. Moran*, 100 F. Supp. 2d 140, 145 (N.D.N.Y. 2000) (internal quotation omitted). *See also Clayton v. City of Kingston*, 44 F. Supp. 2d 177, 183 (N.D.N.Y. 1999).

Plaintiff has failed to allege any facts in either complaint that would remotely state a claim for municipal liability in this case.[11] Thus, the amended complaint must be dismissed with prejudice as against the Sex Offender "Office," and to the extent that plaintiff's claim may be interpreted as a claim against Onondaga County, based on plaintiff naming the Onondaga County Sex Offender Office, the complaint must be dismissed without prejudice.

11      A municipality may only be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. A municipality may not be held liable solely because it employs a tortfeasor. *LaVertu v. Town of Huntington*, No. 13-CV-4378, 2014 WL 2475566, at \*3 (E.D.N.Y. Apr. 4, 2014) (citing inter alia *Los Angeles County, Cal. v. Humphries*, 562 U.S. 29, 35 (2010)), (Rep.-Rec.), *adopted in relevant part*, 2014 WL 2506217 (E.D.N.Y. June 2, 2014).

Riley v. Taylor, Not Reported in Fed. Supp. (2019)

2019 WL 6829046

Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Monell*, 436 U.S. at 694.

To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979). Official policy includes the decisions of a government's lawmakers, the acts of policymaking officials, and practices that are so widespread as to "practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Municipal liability may also be shown by establishing that a policymaking official ordered or ratified the employees' actions either expressly or tacitly. Finally, municipal liability can, under certain circumstances, be based upon a failure to properly train the municipality's employees. *See City of Canton v. Harris*, 489 U.S. 378, 387-90 (1989).

To the extent that the plaintiff is now attempting to name an "officer," he has not indicated who that "officer" might be or how the "officer" was personally involved in any of the conduct alleged by plaintiff. Thus, the amended complaint would have to be dismissed without prejudice as against an unidentified "officer," who is not alleged to have engaged in any unconstitutional conduct.

## VIII. Defense Counsel

### A. Legal Standards

It is well-settled that even a court-appointed defense attorney does not act under color of state law for purposes of section 1983. *Sash v. Rosahn*, 450 F. App'x 42 (2d Cir. 2011); *Jhagroo v. Santos*, No. 19-CV-2037, 2019 WL 1876723, at *2 (E.D.N.Y. Apr. 26, 2019) (citations omitted).

### B. Application

In his amended complaint, plaintiff has named Attorney Robert Earl, Esq. as a defendant. First, Attorney Earl is not mentioned anywhere in the body of the complaint, so it is impossible to know what plaintiff's claims against the attorney might be. The only reason that the court knows that Attorney Earl may currently represent the plaintiff is that the first response to one of the administrative requests attached to the amended complaint states that "Your attorney is Robert Earl...." (AC Attachment at 1). Thus, there is no allegation of the "personal involvement" of Attorney Earl.

**\*7** In any event, as stated above, plaintiff's criminal attorney does not act under color of state law, and there is no jurisdiction under section 1983 to sue him. Thus, the amended complaint must be dismissed as against Attorney Earl for lack of jurisdiction.

## IX. Opportunity to Amend

### A. Legal Standards

Generally, when the court dismisses a pro se complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once, however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

### B. Application

While this court is recommending dismissal without prejudice, plaintiff would not be able to amend at this time based on *Heck* and based on the impropriety of requesting release in a civil rights action. No amendment at this time is available to plaintiff to cure the deficiencies in his complaint. Therefore, the court is recommending dismissal of some of the complaint without prejudice, but without the opportunity to amend at this time.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's request to proceed IFP (Dkt. No. 3) is **GRANTED** for purposes of filing only, and it is

**RECOMMENDED**, that the amended complaint be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE** as against the **ONONDAGA COUNTY SEX OFFENDER OFFICE**, based upon 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim, and it is

**RECOMMENDED**, that the amended complaint be **DISMISSED IN ITS ENTIRETY WITHOUT PREJUDICE as against DEFENDANT ROBERT EARL, ESQ.**, based on lack of subject matter jurisdiction, and it is

**Riley v. Taylor, Not Reported in Fed. Supp. (2019)**

2019 WL 6829046

**RECOMMENDED**, that the amended complaint be **DISMISSED WITH PREJUDICE** against defendant **DENNIS** to the extent that defendant Dennis was acting in her prosecutorial capacity based upon absolute immunity under 28 U.S.C. § 1915(e)(2) (B)(iii), and it is

**RECOMMENDED**, that the remainder of the complaint be **DISMISSED IN ITS ENTIRETY WITHOUT PREJUDICE**, based upon 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim, but without opportunity to amend at this time, and it is

**ORDERED**, that the Clerk serve a copy of this Order and Report-Recommendation on plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 6829046

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 5:19-CV-01451**<br>Riley v. Taylor et al | — | N.D.N.Y. | Nov. 22, 2019 | Docket |

**History (2)**

**Direct History (2)**

1. Riley v. Taylor 👓
2019 WL 6829046 , N.D.N.Y. , Dec. 13, 2019

*Report and Recommendation Adopted by*

2. Riley v. Taylor
2020 WL 886128 , N.D.N.Y. , Feb. 24, 2020

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Kurtz v. Hansell, Not Reported in Fed. Supp. (2021)

2021 WL 1143619

2021 WL 1143619
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Shveta Kakar KURTZ, Daniel L. Kurtz, A.K., a
minor child, and M.K., a minor child, Plaintiffs,

v.

David HANSELL, as the Duly Appointed Commissioner
of the New York City Administration for Children's
Services, Division of Child Protection, New York
Comptroller, City of New York, Yscary Rodriguez,
individually and as a caseworker employed by ACS,
Bhojranie Maygoo, as a caseworker employed by ACS,
Eunice Iwenofu, as a caseworker employed by ACS,
Brenda Lawson, as an ACS case manager/supervisor,
Esperanza Sandoval, as a supervisor in the family support
unit employed by ACS, Dr. Peter Fabricant, as a treating
physician and state actor operating under color of law,
Dr. Marie Lupica, treating physician and state actor
operating under color of law, Dr. Ramzi Marwan Shaykh,
as a treating physician, DR. Shari L. Platt, as a treating
physician and state actor operating under color of law,
Dr. Sheena Ranade, as a treating physician, LSW Karen
Glass, as a state actor, Unnamed ACS Workers and
Employees 1–10, Unnamed Employees and Workers of
New York Presbyterian Hospital/Weill Cornell Medical
Center 1–10, Unnamed Workers and Employees of Mt.
Sinai Hospital 1–10, New York Presbyterian Hospital/
Weill-Cornell Medical Center, Mt. Sinai Hospital,
Administration for Children's Services, Defendants.

20 Civ. 3401 (PAE)
|
Signed 03/24/2021

**Attorneys and Law Firms**

Robert J. Del Col, Smithtown, NY, for Plaintiffs.

Thais R. Ridgeway, New York City Law Department, New
York, NY, Alejandra Rosa Gil, Heidell, Pittoni, Murphy
& Bach, White Plains, NY, Daniel Scott Ratner, Richard
Michael Sullivan, Jr., Heidell, Pittoni, Murphy & Bach, LLP,
Stamford, CT, for Defendants.

OPINION & ORDER

PAUL A. ENGELMAYER, United States District Judge

**\*1** This case arises from—and challenges conduct by
doctors and government officials in connection with—
child-removal proceedings carried out by the New York
Administration for Children's Services ("ACS"). Plaintiffs
Shveta Kakar Kurtz ("Kakar") and Daniel Kurtz ("Kurtz,"
and together with Kakar, the "parents") are the parents of
twin, infant girls, A.K. and M.K., who were born nearly
two months premature. One night while changing A.K.'s
diaper, Kurtz dropped her on the floor of the family's kitchen,
breaking her femur. After the first doctor who examined
A.K. failed to diagnose that injury, the parents took A.K.
to a second hospital, which correctly diagnosed it. Over the
ensuing weeks, after follow-up visits at multiple hospitals,
several medical workers filed reports of suspected abuse or
neglect to ACS. ACS then launched removal proceedings in
New York family court, starting nine months of litigation.
During that time, the parents were either separated from M.K.
and A.K. or had restrictions placed on their contact with them.
Ultimately, after the family moved for summary judgment
in family court, ACS withdrew its removal petition and the
family court dismissed the action with prejudice.

Plaintiffs allege that the removal proceedings resulted from an
unlawful conspiracy between the medical staff who initially
failed to diagnose A.K.'s broken femur, other doctors and
medical institutions, and ACS, aimed at covering up the
first hospital's failure to diagnose A.K.'s femur fracture and
retaliating against the family for its litigiousness. They sue the
City of New York, ACS, two hospitals, and many employees
of each institution under 42 U.S.C. §§ 1983 and 1985, alleging
malicious prosecution, abuse of process, conspiracy, false
imprisonment, and violation of their constitutional rights to
family integrity and freedom of association. They also bring
claims under state law for, *inter alia*, intentional infliction
of emotional distress ("IIED"), medical malpractice, loss of
consortium and companionship, and defamation.

Before the Court now are four motions to dismiss: three
by groups of private medical professionals ("Medical
Defendants") and the fourth by the City of New York on
behalf of all municipal employees and entities sued and
served thus far ("Municipal Defendants"). For the reasons that
follow, the Court grants those motions in part and denies them
in part.

Case 5:26-cv-00698-MAD-MJK    Document 5    Filed 04/21/26    Page 37 of 72

Kurtz v. Hansell, Not Reported in Fed. Supp. (2021)
2021 WL 1143619

## I. Background

### A. Factual Background [1]

[1]  This factual account draws from the amended complaint, Dkt. 55 ("Am. Compl."). *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court has also considered publicly filed documents from the underlying family-court proceedings, although not for the truth of the matters asserted in those documents. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (citation omitted)); *Davis v. Whillheim*, No. 17 Civ. 5793 (KPF), 2019 WL 935214, at *6 (S.D.N.Y. Feb. 26, 2019) (taking judicial notice of "publicly available filings, orders, and appeals in the Family Court system"); *Lamont v. Farucci*, No. 16 Civ. 7746 (KMK), 2017 WL 6502239, at *1 n.4 (S.D.N.Y. Dec. 18, 2017) (same). Those include the removal petition, order of dismissal, and similar documents submitted by the defendants in connection with the motions to dismiss.

### 1. Parties

#### a. Plaintiffs

**\*2**  Kakar and Kurtz are the biological parents of A.K. and M.K. Am. Compl. ¶¶ 8–9. A.K. and M.K. are fraternal twins who were born nearly two months premature, on June 4, 2018. *Id.* ¶ 10. Between August 2018 and May 2019, the parents were named as respondents in child-removal proceedings in New York family court, in which ACS alleged that they had abused A.K. and derivatively neglected M.K. *Id.* ¶¶ 8–10.

#### b. Defendants

Plaintiffs have sued many people and entities. For clarity, the Court groups them as they have grouped themselves in filing motions to dismiss.

##### i. Municipal Defendants

Plaintiffs have sued ACS employees, ACS itself, the City of New York ("the City"), and others. [2] David Hansell is the Commissioner of ACS. *Id.* ¶ 12. Brenda Lawson is a director of field operations for ACS and is alleged to have "made the determination to commence an emergency removal proceeding" in order to "teach [the parents] a lesson." *Id.* ¶ 15. Yscary Rodriguez, Bhojranie Maygoo, and Eunice Iwenofu are ACS caseworkers. *Id.* ¶¶ 13–14, 17. Rodriguez was the primary point of contact between plaintiffs and ACS, and worked with Maygoo. *Id.* ¶¶ 13–14. Iwenofu took over Rodriguez's responsibilities in October 2018. *Id.* ¶ 17. Plaintiffs allege that both Rodriguez and Iwenofu disagreed with ACS's decision to commence removal proceedings. *Id.* Lawson supervised Rodriguez. *Id.* ¶ 15. Esperanza Sandoval supervised Iwenofu. *Id.* ¶ 18.

[2]  Plaintiffs also name the New York Comptroller and Division of Child Protection as defendants, but do not allege any facts about them. In any event, as discussed below, these are not proper parties to this lawsuit.

##### ii. Medical Defendants

*Weill Cornell Defendants*: New York Presbyterian Hospital/ Weill Cornell Medical Center ("Weill Cornell") is a hospital on the Upper East Side of Manhattan, where the parents first took A.K. on the night of her injury because of its proximity to their home. *Id.* ¶ 33. Dr. Marie Lupica is an attending physician there who treated A.K. that night. *Id.* ¶ 34. Plaintiffs allege that she negligently failed to diagnose A.K.'s femur fracture, improperly discharged A.K., and later sought to cover up that error by reporting the parents to ACS. *Id.* ¶¶ 34–35. Dr. Ramzi Marwan Shaykh is a resident at Weill Cornell who also treated A.K. the same night. *Id.* ¶ 36. Dr. Shari Platt

Case 5:26-cv-00698-MAD-MJK    Document 5    Filed 04/21/26    Page 38 of 72

Kurtz v. Hansell, Not Reported in Fed. Supp. (2021)
2021 WL 1143619

is the director of emergency medicine at Weill Cornell. *Id.* ¶ 37. Although she never saw or treated A.K., she supervises Dr. Lupica and, after being notified of Dr. Lupica's alleged misdiagnosis, allegedly conspired with others to cover up that error. *Id.*

*Mt. Sinai Defendants*: A.K. and M.K. were born at Mt. Sinai Hospital ("Mt. Sinai"), where they remained in the neonatal intensive care unit ("NICU") for nearly two months after their birth. *Id.* ¶ 49. On the night of A.K.'s injury, the parents took her to Mt. Sinai after Dr. Lupica discharged her from Weill Cornell but A.K. continued to be in pain. *Id.* There, A.K. was diagnosed with a femur fracture. *Id.* ¶ 20. Several days later, after the parents brought A.K. back to Mt. Sinai for a follow-up visit, she was examined by Dr. Sheena Ranade, a pediatric orthopedist, who administered additional x-rays to assess a potential clavicle fracture. *Id.* ¶¶ 22–24. Dr. Ranade is the co-author of an article published in the *Journal of the American Academy of Orthopedic Surgeons* titled "The Role of the Orthopedic Surgeon in the Identification and Management of Non-Accidental Trauma"; plaintiffs allege that Dr. Ranade was "predisposed" to perceive abuse where there was, in fact, none. *Id.* ¶ 58. Dr. Ranade reported the parents to ACS for suspected abuse or neglect after the August 13, 2018 visit. *Id.* ¶ 57.

**\*3** *HSS Defendants*: Weeks later, the parents took A.K. for a single follow-up examination at the Hospital for Special Surgery ("HSS"). *Id.* ¶ 38. There, she was seen by Dr. Peter Fabricant. *Id.* Karen Glass is a social worker at HSS who also had contact with the parents and A.K. that day. *Id.* ¶ 41. Dr. Fabricant later contacted Dr. Platt at Weill Cornell, an alleged "affiliate" of HSS, to notify her about Weill Cornell's failure to diagnose A.K.'s femur fracture. *Id.* ¶¶ 38–39. Glass later filed a report of suspected abuse to ACS and Dr. Fabricant met with ACS, Dr. Lupica, and Dr. Ranade on the morning that ACS ultimately commenced removal proceedings. *Id.* ¶ 83.

### 2. The August 8, 2018 Injury

On August 8, 2018, while changing A.K.'s diaper, Kurtz dropped her onto the kitchen floor. *Id.* ¶ 47. He and Kakar then walked her to the emergency room ("E.R.") at Weill Cornell, two blocks from their home. *Id.* They arrived at about 7 p.m.; A.K. spent the several hours in the ER. *Id.* ¶ 48. There, Dr. Lupica treated her for "no more than five minutes." *Id.* Weill Cornell conducted a CT scan of A.K.'s head, but not a full body exam "despite obvious discomfort to her lower

extremities." *Id.* Kurtz also "had to urge the resident" to mind A.K.'s neck, which "was still in obvious pain." *Id.* Dr. Lupica discharged A.K. around midnight. *Id.*

Once home, the parents noticed that A.K. was in continued pain and not moving her left leg. *Id.* ¶ 49. Concerned, they took her to Mt. Sinai later that night. *Id.* There, she was diagnosed with a femur fracture, as well as "healing" and "calcified" rib fractures, which plaintiffs allege occurred in the NICU after her premature birth. *Id.* ¶ 50. She was also examined by, among others, non-defendant Dr. Katherine Grimm, a pediatric-abuse specialist, who concluded there was no evidence of abuse and, on August 9, 2018, discharged A.K. *Id.* ¶ 51. On August 10, 2018, the parents took A.K. to their pediatrician, Dr. Laura Popper, who expressed concern at Weill Cornell's failure to diagnose A.K.'s broken femur. *Id.* ¶ 52.

### 3. August 13, 2018 Follow-Up at Mt. Sinai and First ACS Report

On August 13, 2018, the parents took A.K. to Mt. Sinai for a follow-up examination. *Id.* ¶ 53. There, she was examined by Dr. Ranade. *Id.* Dr. Ranade expressed concern that, in addition to the femur fracture, A.K. might have suffered a clavicle fracture. *Id.* ¶¶ 54–55. She also told the parents that she suspected A.K. might have brittle-bone disease, and advised them to have A.K. admitted to the E.R. for genetic testing. *Id.* ¶¶ 55–56. The parents heeded that recommendation; A.K. was admitted to the Mt. Sinai E.R. *Id.* ¶ 56.

However, the parents soon learned that Dr. Ranade had contacted ACS and that A.K. would not be able to leave the hospital that day. *Id.* ¶¶ 56–57.[3] Soon, two detectives and two ACS caseworkers—Rodriguez and Maygoo—arrived at Mt. Sinai to speak with the parents. *Id.* ¶ 61. While A.K. remained in the hospital, the detectives and caseworkers, along with the parents, went back to the family's home to perform an inspection. *Id.* ¶ 62. There, they spoke with the family's 24-hour live-in baby nurse, who corroborated Kurtz's account of how A.K.'s injury had occurred on August 8, 2018. *Id.* The detectives left, and never contacted the family again. *Id.* ¶ 63. ACS's Rodriguez stated that, although she had few concerns, the matter would have to remain open for 60 days, during which time she would periodically visit the home. *Id.* Between August 14 and 30, 2018, she did so, without event. *Id.* ¶ 65. On August 14, 2018, Dr. Grimm interviewed the parents, conducted further tests, and was left

Case 5:26-cv-00698-MAD-MJK   Document 5   Filed 04/21/26   Page 39 of 72

**Kurtz v. Hansell, Not Reported in Fed. Supp. (2021)**

2021 WL 1143619

with no suspicion of abuse or neglect. *Id.* ¶ 64. A.K. was then discharged from Mt. Sinai. *Id.*

3    Plaintiffs allege that those x-rays did not show additional fractures or injuries, including to A.K.'s clavicle, but elsewhere state that the results were "inconclusive." *Id*. ¶¶ 25, 59, 105.

### 4. August 23, 2018 Follow-Up at HSS

 **\*4**  On August 23, 2018, the parents took A.K. for a second follow-up examination, this time at HSS, where she was examined by Dr. Fabricant. *Id.* ¶ 68. He took an x-ray and concluded that A.K.'s femur was healing well. *Id.* He also informed the parents that he was a mandatory reporter and would have to report the injury to ACS. *Id.* ¶ 69. After the parents told him that ACS had already been contacted, Dr. Fabricant responded that, in that case, he would need only to access Mt. Sinai's medical records. *Id.* The parents agreed to authorize such access, and met with Glass, a social worker at HSS, to sign a medical release. *Id.*

### 5. August 27-29, 2018 Email Chain and Second ACS Report

On August 27, 2018, Dr. Fabricant wrote Dr. Platt at Weill Cornell to give her a "heads up" that Weill Cornell had apparently failed to diagnose A.K.'s injury. *Id.* ¶ 70. He asked whether, in fact, the treating doctor had solely focused on "head trauma," rather than the broken femur and, if so, whether it was "perhaps a systems issue that could be addressed?" *Id.* Dr. Platt responded, confirming that it was "a definite miss" and that she had "educated her attending," *i.e.*, Dr. Lupica. *Id.* ¶ 71.

However, Dr. Platt soon emailed again. In that follow-up, she forwarded Dr. Lupica's response to her. Dr. Lupica there claimed that, having reviewed the Mt. Sinai records that Dr. Platt had apparently sent her, "there was no way that the baby had that injury when [I] saw him," given that "I watched him for 4 hours." *Id.* ¶¶ 73–74.[4] Dr. Lupica also stated that the femur break seemed "as though it required brute force of pressure to break," and that "child abuse seems to be the diagnosis now." *Id.* ¶ 75. In response, HSS social worker Glass emailed back that she "HIGHLY recommend[ed] for [Weill] Cornell to contact the ACS worker and share [Dr. Lupica's story]." *Id.* ¶ 77. Dr. Fabricant agreed,

recommending that Dr. Lupica "talk with the ACS worker." *Id.* ¶ 78.

4    Plaintiffs note that Dr. Lupica, in this email, misidentified A.K.'s gender. They also allege that Dr. Lupica's claim to have spent four hours with A.K. in the E.R. was a lie. Am. Compl. ¶ 74.

On August 28, 2018, Glass contacted Rodriguez and the ACS-mandated reporter line, filing a report of suspected child abuse based on the August 8, 2018 injury. *Id.* ¶ 79. On August 29, 2018, Dr. Platt responded on the email chain, describing the parents as "dangerous," thanking Glass and Dr. Fabricant for "partnering" with Weill Cornell, and asking them to let her know if they needed to "collaborate" further. *Id.* ¶ 80. On August 30, 2018, Dr. Lupica wrote to the email chain, confirming that she had spoken with an ACS caseworker. *Id.* ¶ 81.

### 6. ACS's Investigation and Commencement of Removal Proceedings

On August 28, 2018, after Glass made her report to ACS, two ACS caseworkers arrived at the hotel where the parents were staying while their apartment underwent repairs. *Id.* ¶ 92. They informed the parents that they were there as a result of a separate report by Dr. Fabricant. *Id.* ¶¶ 93–94. The parents reacted with astonishment, anger, and outrage, admonishing the caseworkers for announcing themselves as child-protective services at the hotel reception. *Id.* ¶ 95. On August 29, 2018, Rodriguez visited the parents again, informing them that a family support conference ("FSC") had been scheduled for the next morning at 10:30 a.m.[5]

5    Plaintiffs allege that FSCs are expected to seek to maintain intact families and pursue solutions other than removal. Am. Compl. ¶ 98.

On August 30, 2018, ACS held an FSC, at which the parents, their family, and many friends testified in support of the parents. *Id.* ¶¶ 99–100. It was cut short, however, when Brenda Lawson, representing ACS, stated that ACS was recommending removal and intended to take the matter to family court that afternoon. *Id.* ¶ 101. Kakar alleges that, the same morning, she learned from an unidentified source that Lawson had been "livid" about the parents' treatment of ACS's caseworkers at the hotel on August 28, 2018, and had

Case 5:26-cv-00698-MAD-MJK    Document 5    Filed 04/21/26    Page 40 of 72

Kurtz v. Hansell, Not Reported in Fed. Supp. (2021)
2021 WL 1143619

been overheard stating, "Who do they think they are? ... Just because they are rich lawyers.... I will show them." *Id.* ¶ 102.

**\*5** The same day, ACS filed, in New York family court, a petition to terminate parental rights.[6] The Petition's addendum, which set forth the Petition's factual basis, stated that Dr. Ranade had reported that A.K. "presented with injuries to her collarbone," and that the x-rays she took "came back inclusive."[7] *Id.* ¶ 105. It also cited Dr. Lupica's claim that, when she examined A.K. on August 8, 2018, "there [was] no way that the baby had a leg fracture," given that she "was moving her arms and legs," and that her medical opinion was that A.K.'s injuries did not occur as Kurtz had reported. Petition at 6–7. It did not disclose Dr. Grimm's prior assessment that "this was an unfortunate accident for a premature baby," that "both clavicles looked the same" from the x-rays, and that "no one can testify at this time that this infant was abused," despite evidence that Lawson had spoken with Dr. Grimm twice on August 14, 2018. Am. Compl. ¶ 109; *see id.* ¶ 108 (Dr. Grimm reporting that a "clavicle fracture has not been confirmed by radiology and when I saw the baby, she lifted both arms spontaneously").

6      The Amended Complaint characterizes the petition as an "emergency petition," but the petition is not styled as such. The protective order issued that day, citing "exigent circumstances and allegations in the petition" and entitled "ORDER (Directing Temporary Removal of Child-After Petition Filed)," was issued by a court, after a preliminary hearing, pursuant to N.Y. Fam. Ct. Act. § 1027, which does not provide for emergency removal. *See* Dkt. 100 ("Ridgeway Decl."), Exs. A ("Petition"), C ("Removal Order"); *cf.* N.Y. Fam. Ct. Act § 1024 ("Emergency Removal Without Court Order").

7      The Amended Complaint notes that the results of the August 13, 2018 x-rays were, in fact, "inconclusive," not "inclusive." Am. Compl. ¶¶ 25, 105.

Also on August 30, 2018, the family court, with Judge Frias-Colon presiding, held a preliminary hearing on the ACS Petition. *Id.* ¶ 106. ACS's attorney represented at the hearing that A.K. "does have a collarbone fracture," which had been confirmed by x-rays, despite the above evidence, allegedly in ACS's possession, to the contrary. Am. Compl. ¶ 106. According to the hearing transcript, doctors Lupica, Fabricant, and Ranade had met with ACS that morning to, as plaintiffs characterize it, "press the case" for removal. *Id.* ¶ 83. After the hearing, the family court issued an order directing A.K.'s temporary removal from the family home, because she "has presented with injuries and allegations of physical abuse were made with no plausible explanation given." Removal Order at 1. The court directed that A.K. and M.K. be temporarily placed with Rahul Kakar, their maternal uncle, pending the removal proceeding. *Id.*; Am. Compl. ¶ 117.

### 7. Post-Removal Events

Between August 30 and October 2, 2018, A.K. and M.K. resided with their uncle on Long Island. Am. Compl. ¶ 117. The family court then modified its order to allow Kakar's mother, who moved from India to New York City "on a moment's notice," to assume custody of the children while living in plaintiffs' home and sleeping on their floor. *Id.* At no point were the parents permitted to be alone with either daughter. *Id.* ¶ 118.

On September 10, 2018, the parents took A.K. for a follow-up appointment with Dr. Ranade, accompanied by their live-in baby nurse. *Id.* ¶¶ 120, 124. There, they confronted Dr. Ranade about her "misleading" ACS report; Dr. Ranade recommended that they see another doctor, but the parents stated that, given the ACS proceeding, they had no choice but to remain with her. *Id.* ¶ 122. After the appointment, Dr. Ranade reported to ACS that the parents had brought A.K. to the appointment unsupervised. *Id.* ¶ 123. The plaintiffs allege this was wrong, and that the baby nurse waited in the reception area while the parents met with Dr. Ranade. *Id.* ¶ 124. On October 4, 2018, at another follow-up visit with Dr. Ranade, she ordered x-rays of A.K.'s clavicle to look for "healing fractures," which the parents did not authorize *Id.* ¶ 125.

**\*6** On October 30, 2018, ACS's Rodriguez and Iwenofu visited the parents and A.K., and told the parents they did not agree with their supervisors and "did not believe this was an abuse case." *Id.* ¶¶ 127–28. Yet Iwenofu stated, if the parents wanted to see the case resolved, they would likely have to admit to some neglect. *Id.* ¶ 129. She also stated that she "had never seen a case discharged without 'someone taking the blame.' " *Id.*

On December 4, 2018, the parents gave ACS and the family court four affidavits—one from Dr. Grimm, one from the

Case 5:26-cv-00698-MAD-MJK    Document 5    Filed 04/21/26    Page 41 of 72

Kurtz v. Hansell, Not Reported in Fed. Supp. (2021)
2021 WL 1143619

family's pediatrician, and two from doctors with whom ACS had consulted "for over a decade"—each concluding that (1) the femur fracture was consistent with an accidental fall, not abuse; (2) any rib fractures were consistent with bone fragility due to premature birth; and (3) there was no "conclusive" evidence of a clavicle fracture on August 13, 2018. *Id.* ¶¶ 136–40. After reviewing these reports, the family court judge's clerk counseled ACS that it "may want to reconsider its position." *Id.* ¶ 141.

On January 9, 2019, ACS stated that it was seeking to retain a neutral expert, and if the expert agreed there was no abuse, they would withdraw the petition. *Id.* ¶ 155. At a February 4, 2018 hearing, ACS represented that its expert, Dr. Hoffman-Rosenfeld, had reviewed all of Mt. Sinai's and HSS's medical records. *Id.* ¶ 158. But it soon became clear that that statement was untrue, as ACS had instead sent her the August 27–30, 2018 email chain between the HSS Defendants, Dr. Platt, and Dr. Lupica, and not other actual medical records. *Id.* ¶¶ 159–62.

At a February 6, 2018 hearing, ACS's position began to soften. It stated that Dr. Hoffman-Rosenfeld "cannot state physically what happened at this time," and that she would need to interview the parents and conduct physical examinations of A.K. and M.K. *Id.* ¶ 163. In response, Judge Frias-Colon remarked that this substantial reversal gave her "some concern about the decision to have filed this as an abuse case as opposed to being truly what everyone said from the beginning which was a tragic accident." *Id.* ¶ 167.

On April 10, 2019, the parents moved for summary judgment in the removal proceeding. *Id.* ¶ 172. On May 2, 2019, Dr. Hoffman-Rosenfeld concluded that A.K.'s femur break "could have resulted from a fall," that the "rib fractures are consistent with fractures related to metabolic bone disease of prematurity," that the healing timeline comported with their occurrence before discharge from the NICU, and that, after "review of the radiology, no clavicle fracture was identified." *Id.* ¶ 175.

On May 7, 2019, ACS withdrew its Petition. *Id.* ¶ 176. The same day, the family court dismissed it with prejudice. *Id.*

### B. Procedural History
On May 1, 2020, plaintiffs filed the Complaint, Dkt. 1, and on May 5, 2020, the Amended Complaint. Dkt. 55. On August 14, 2020, the Mt. Sinai Defendants filed a motion to dismiss, Dkt. 89, and a memorandum of law in support, Dkt. 89-1

("Mt. Sinai Mem."). The same day, the HSS Defendants filed a motion to dismiss, Dkt. 93, and a memorandum of law in support, Dkt. 97 ("HSS Mem."). On August 18, 2020, the Municipal Defendants filed a motion to dismiss, Dkt. 99, along with a memorandum of law in support, Dkt. 101 ("City Mem."), and the declaration of Thais. R. Ridgeway, Esq., with supporting exhibits.

On August 19, 2020, the Court issued an order directing plaintiffs either to amend their complaint or oppose the pending motions to dismiss, and noting that no further opportunities to amend would be given. Dkt. 102. On September 16, 2020, the Court granted the Municipal Defendants' request that their motion also apply to the claims against Commissioner Hansell, who had not been served at the time they filed their motion. Dkt. 110. On September 23, 2020, the Weill Cornell defendants filed a motion to dismiss, Dkt. 112, and a memorandum of law in support, Dkt. 114 ("Weill Cornell Mem."). The same day, the Court again notified plaintiffs of their right to amend and stated that no further opportunities to do so would ordinarily be granted. Dkt. 115.

**\*7** On November 13, 2020, plaintiffs opposed the motions to dismiss. Dkt. 123 ("Pl. Opp'n"), and filed the declaration of Robert Del Col, Dkt. 123-1 ("Del Col Decl."), and exhibits. On December 10, 2020, the HSS Defendants and Weill Cornell Defendants replied. Dkts. 126 ("HSS Reply"), 129 ("Weill Cornell Reply"). On December 29, 2020, the Mt. Sinai defendants replied. Dkt. 133 ("Mt. Sinai Reply"). On January 13, 2020, the Municipal Defendants replied, Dkt. 136 ("City Reply").

### II. Applicable Legal Standards
To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer

Case 5:26-cv-00698-MAD-MJK   Document 5   Filed 04/21/26   Page 42 of 72

Kurtz v. Hansell, Not Reported in Fed. Supp. (2021)
2021 WL 1143619

only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Discussion

Plaintiffs—the parents and their minor daughters—claim here that ACS's child-removal action, and the reports of child abuse by the Medical Defendants that prompted it, resulted from an elaborate conspiracy between all named defendants to deprive plaintiffs of their constitutional rights. The Medical Defendants, they allege, sought to cover up Weill Cornell's failure to diagnose A.K.'s femur fracture by concocting spurious reports of child abuse that shifted blame away from Weill Cornell. And ACS, they allege, relying on those false reports and lacking probable cause, launched removal proceedings that it was ultimately forced to abandon, in retaliation for the parents' litigiousness and hostility toward ACS's caseworkers. The result, they allege, was a nine-month ordeal in which the parents were forcibly separated from their newborn twin daughters and, once reunited, subjected to unjustified restrictions on their association with them.

Based on this version of events, plaintiffs bring three sets of federal claims: under § 1983, for malicious prosecution, abuse of process, conspiracy, intentional deprivation of constitutional rights, and false imprisonment, against all defendants; under § 1985, for conspiracy, against all defendants; and for the deprivation of constitutional rights against the City of New York, based on, *inter alia*, an alleged custom and practice of commencing child-removal proceedings without probable cause, actionable under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). [8] Plaintiffs also bring state-law claims for malicious prosecution, abuse of process, loss of consortium and companionship, and IIED, against all defendants; for medical malpractice against the Weill Cornell Defendants and Dr. Ranade; and for defamation against Dr. Platt, Dr. Ranade, and Glass.

[8]     Confusingly, plaintiffs purport to bring a *Monell* claim against all defendants. The *Monell* doctrine, however, relates uniquely to § 1983 claims against municipal entities.

**\*8** In response, the Medical Defendants, across three separate motions to dismiss, argue that the Amended Complaint does not plausibly allege either that they are state actors or that they conspired with any state actor, and so they cannot be sued under § 1983. They also argue

that, even if state actors, they are immune to liability for reporting suspected child abuse in their roles as mandatory reporters of such abuse. Finally, they contend that plaintiffs fail to plausibly allege the elements of any of their causes of action. The Municipal Defendants, too, urge dismissal of all claims against them. [9] First, they assert that several defendant entities are not proper parties to this action. Second, they argue that none of plaintiffs' causes of action states a claim.

[9]     With a narrow exception, these defendants do not argue that they are entitled to qualified immunity. Their opening brief cursorily referenced such a defense, solely as to plaintiffs' conspiracy claims, but this argument was not developed until their reply—and, even then, only in a single paragraph. *See* City Mem. at 19; City Reply at 6. "It is well established, of course, that arguments first raised in reply briefs are forfeited or waived." *Chevron Corp. v. Donziger*, 325 F. Supp. 3d 371, 379 (S.D.N.Y. 2018). And qualified immunity provides an affirmative defense, as to which defendants have the burden of proof. *Se McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004). The Court thus will not consider these arguments on the present motion to dismiss.

The Court first addresses whether plaintiffs have improperly sued certain non-suable entities. Then, the Court considers plaintiffs' federal claims under §§ 1983 and 1985. Finally, the Court addresses plaintiffs' state-law claims.

### A. Proper Parties

The Municipal Defendants first argue that plaintiffs' claims against ACS, the New York Comptroller, and the Division of Child Protection must be dismissed because, by statute, they are not suable entities. That is correct. *See* N.Y. City Charter, Ch. 17 § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); *Graham v. City of New York*, 869 F. Supp. 2d 337, 348 (E.D.N.Y. 2012) ("ACS is an agency of the City of New York and cannot be sued independently."); *Emerson v. City of New York*, 740 F. Supp. 2d 385, 395–96 (S.D.N.Y. 2010) (same). Plaintiffs are silent in the face of this motion. *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08 Civ. 442 (TPG), 2014 WL 4723299, at \*7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage, where review is limited to the pleadings, a

Kurtz v. Hansell, Not Reported in Fed. Supp. (2021)
2021 WL 1143619

Case 5:26-cv-00698-MAD-MJK    Document 5    Filed 04/21/26    Page 43 of 72

plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

Accordingly, the Court dismisses ACS, the New York Comptroller, and the Division of Child Protection. [10]

[10]    The latter entity, the Division of Child Protection, is named (although not discussed) in the Amended Complaint. Plaintiffs appear not to have served that entity, despite the Court's having several times extended the deadline to effect service, *see* Dkts. 106, 119, which has now passed. This independently warrants its dismissal. *See* Fed. R. Civ. P. 4(m); *Zapata v. City of New York*, 502 F.3d 192, 197 (2d Cir. 2007) (dismissal under Rule 4(m) appropriate even where plaintiff would be time-barred from bringing renewed action). Contemporaneous with this decision, the Court is issuing an order as to plaintiffs' claims against other non-served defendants.

### B. Federal Claims

#### 1. State Action

At the threshold, each group of Medical Defendants argues that they cannot be liable under § 1983 because they are not state actors. *See* Mt. Sinai Mem. at 5–9; HSS Mem. at 11–15; Weill Cornell Mem. at 8–12. Plaintiffs concede that, as a matter of law, the mere reporting of a crime or child abuse to the authorities does not typically rise to the level of state action. But, they argue, the Medical Defendants went beyond reporting, and became active participants in ACS's child-removal proceedings, so as to make them state actors subject to liability under § 1983. On this issue, the Court holds with the Medical Defendants.

**\*9**  "An essential element of a § 1983 claim is that the defendant act under color of state law." *Mortimer v. City of New York*, No. 15 Civ. 7186 (KPF), 2018 WL 1605982, at *12 (S.D.N.Y. Mar. 29, 2018). Section 1983 thus generally applies to public officers, not private citizens. However, in certain circumstances, private actors can be considered to have acted "under color of state law." *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002). For purposes of § 1983,

the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate" ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)); *see Ciambriello*, 292 F.3d at 324 ("[A] private actor acts under color of state law when the private actor 'is a willful participant in joint activity with the state or its agents.' " (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970))).

With near uniformity, courts in this Circuit have applied these principles to hold that "reporting suspected child abuse alone does not constitute state action." *J.C. v. Mark Country Day Sch.*, No. 03 Civ. 1414 (DLI) (WDW), 2007 WL 201163, at *3 (E.D.N.Y. Jan. 23, 2007) (collecting cases); *Topolski v. Wrobleski*, No. 13 Civ. 872 (LEK), 2013 WL 5652724, at *1– 3 (N.D.N.Y. Oct. 16, 2013) (allegations that private actors falsely reported child abuse in effort to commence child-removal proceedings insufficient to plead state-actor status); *Ogunbayo v. Montego Med. Consulting P.C.*, No. 11 Civ. 4047 (NGG) (CLP), 2012 WL 6621290, at *12 (E.D.N.Y. Sept. 18, 2012) (report of suspected child abuse not state action where no allegation that "ACS influenced the substance of the medical defendants' evaluation"), *adopted as modified*, 2012 WL 6625921 (E.D.N.Y. Dec. 19, 2012); *Mione v. McGrath*, 435 F. Supp. 2d 266, 272 (S.D.N.Y. 2006) (hotel employees who reported suspected child abuse to authorities, leading to initiation of neglect proceedings, not state actors under § 1983); *Storck v. Suffolk Cnty. Dep't of Soc. Servs.*, 62 F. Supp. 2d 927, 941 (E.D.N.Y. 1999) (doctors who "reported their suspicions of child abuse pursuant to a state statute" not state actors); *Deckon v. Chidebere*, No. 93 Civ. 7965 (LMM), 1995 WL 555684, at *4 (S.D.N.Y. Sept. 19, 1995), *aff'd*, 101 F.3d 1393 (2d Cir. 1996); *cf. Est. of Keenan v. Hoffman-Rosenfeld*, No. 16 Civ. 0149 (SFJ) (AYS), 2019 WL 3410006, at *19 (E.D.N.Y. July 29, 2019) (holding, at summary judgment, that hospital defendants were not state actors where they allegedly " 'conspired with each other to advance a false narrative and took advantage of the plainly incompetent [Child Protective Services] workers' to cause the Protective Proceedings to be brought against the Parents"), *aff'd*, 833 F. App'x 489 (2d Cir. 2020); *Estiverne v. Esternio-Jenssen* ("*Estiverne III*"), 910 F.

Case 5:26-cv-00698-MAD-MJK    Document 5    Filed 04/21/26    Page 44 of 72

Kurtz v. Hansell, Not Reported in Fed. Supp. (2021)

2021 WL 1143619

Supp. 2d 434, 444 (E.D.N.Y. 2012) (holding, after trial, doctor not state actor where she did not "play[ ] any role—other than to provide her medical opinion—in the decision to file a petition for removal").

**\*10**  The Medical Defendants argue that they similarly were private actors who simply reported suspected abuse to ACS. Plaintiffs respond that the facts alleged show the Medical Defendants to have gone beyond their role as mandatory reporters and "exert[ed] undue influence to obtain a desired outcome." Pl. Opp'n at 24. They rely on the following allegations. First, Dr. Ranade had x-rays of A.K.'s clavicle taken on August 13, 2018, at the follow-up visit during which she contacted ACS, after admitting A.K. to the E.R. for the ostensible purpose of taking genetic tests. Am. Compl. ¶ 59. Second, Glass, Dr. Fabricant, Dr. Lupica, and Dr. Platt engaged in discussions over email that ostensibly reflect a conspiracy to falsely report child abuse to ACS. In that thread, Dr. Fabricant first wrote to Dr. Platt to notify her that Weill Cornell appeared to have failed to diagnose A.K.'s broken femur and to ask if that failing was indicative of any "systems issue" that could be remedied. *Id.* ¶ 70. Dr. Platt responded that "it was a definite miss" and that she had "educated" Dr. Lupica. *Id.* ¶ 71. Then, however, Dr. Lupica responded to Dr. Platt (in a response that Dr. Platt forwarded to Dr. Fabricant and Glass) that she did not believe A.K. had had those injuries when she saw "him," and that she now suspected abuse. *Id.* ¶¶ 72–75. Apparently believing Dr. Lupica's story, the others then agreed that she should report to ACS; then, she and others did so. *Id.* ¶¶ 77–81. Third, without supporting allegations, plaintiffs contend that Dr. Fabricant, Dr. Ranade, and Dr. Lupica met with ACS on August 30, 2018, to "press the case for [A.K.] and [M.K.] to be removed from their parents' care," and that ACS filed its removal petition the same day. *Id.* ¶ 83. Last, they state that on September 10, 2018, Dr. Ranade falsely reported the parents for bringing A.K. to see her alone, and on October 4, 2018, took unauthorized investigatory x-rays. *Id.* ¶¶ 120–25.

These allegations do not make any of the Medical Defendants state actors.

As to Dr. Fabricant, Dr. Platt, and Glass, the Amended Complaint does not allege more than that they, apparently believing Dr. Lupica's story, decided it was appropriate to report the suspected abuse to ACS, as required under N.Y. Soc. Serv. Law § 413. In fact, the Amended Complaint largely depicts Dr. Fabricant and Dr. Platt as open to recognizing, and addressing, Weill Cornell's lapse in failing to diagnose

A.K.'s fracture. *See, e.g.*, Am. Compl. ¶¶ 70–71. Glass merely reported to ACS, *see id.* ¶ 79, and Dr. Platt does not even appear to have done that much. And Fabricant's meeting with ACS—along with Dr. Lupica and Dr. Ranade—on August 30, 2018, which is described only in vague terms in the Amended Complaint, as alleged did not entail more than furnishing ACS with a medical assessment based on his observations of A.K. and the parents. *See id.* ¶ 83. Fabricant is not alleged to have urged ACS to take specific action. The Amended Complaint states that, at that meeting, Fabricant "press[ed] the case" for removal, but that conclusory allegation is unsupported by any concrete facts. It cannot be relied upon for purposes of this motion. *Id.*

The allegations about Dr. Lupica, taken as true, are of a different character. She is alleged to have lied about A.K.'s condition at the time she examined A.K. on August 8, 2018, with the goal of shifting attention from her errant diagnosis, and the consequence of giving the false diagnosis of a later act of child abuse. According to the Amended Complaint, Dr. Lupica's statement that A.K. could not possibly have had a femur fracture when she saw her on August 8, 2018, was deliberately false. *See id.* ¶ 75. Although some allegations as to this act are conclusory, *see, e.g.*, *id.* ("This was a slanderous fiction made up by Defendant Lupica"), the overall facts alleged as to this point are concrete enough to make the parents' claim of such a falsehood plausible. For example, the Amended Complaint alleges that, despite only seeing A.K. for five minutes on August 8, 2018, Dr. Lupica later falsely reported spending four hours with her. *Id.* ¶ 74. And although A.K. is female, Dr. Lupica stated that she watched "him" for that entire four-hour period, calling into doubt her claim of such a long, or of an attentive, observation. *Id.* Moreover, the circumstances of the email exchange—that Dr. Lupica's superior, Dr. Platt, had emailed her to "educate" her as to her significant "miss"—provides a plausible motive for Dr. Lupica to dissemble: to cover up her own malpractice. Claiming that A.K.'s femur had not been broken when she examined the child deflected blame and changed the narrative from a faulty diagnosis to a later act of child abuse. *See, e.g.*, *id.* ¶ 75. The Amended Complaint's allegation is thus well-pled that Dr. Lupica falsely claimed that A.K.'s injuries were not present when she examined her on August 8, 2018, and that the parents' account of how such injuries occurred was inconsistent with her diagnosis.

**\*11**  But this falsehood, while exposing Dr. Lupica to potential liability under state law, *see infra* pp. 46–47, does not make her a state actor under § 1983. *See, e.g.*,

*Moreno v. Town of Greenburgh*, No. 13 Civ. 7101 (VB), 2014 WL 3887210, at *3 (S.D.N.Y. June 9, 2014) (no state action where defendant provides "false and misleading" information to prosecutors "even if the information provided is deliberately false"); *Rodriguez v. Winski*, 973 F. Supp. 2d 411, 429 (S.D.N.Y. 2013) ("[E]ven assuming that [defendant] had deliberately provided false information to police, such provision alone is not sufficient" to make him a state actor); *Vazquez v. Combs*, No. 04 Civ. 4189 (GEL), 2004 WL 2404224, at *4 (S.D.N.Y. Oct. 22, 2004) ("But merely filing a complaint with the police, reporting a crime, requesting criminal investigation of a person, or seeking a restraining order, *even if the complaint or report is deliberately false*, does not give rise to a claim against the complainant for a civil rights violation." (emphasis added)). Rather, "one's motivation is irrelevant to the determination of whether one is a state actor." *Shapiro v. Goldman*, No. 14 Civ. 10119 (NRB), 2016 WL 4371741, at *11 (S.D.N.Y. Aug. 15, 2016) (quoting *Young v. Suffolk County*, 705 F. Supp. 2d 183, 196 (E.D.N.Y. 2010)). Indeed, in a similar context, a court in this District has held that doctor not a state actor under § 1983 even though he had been hired by ACS in connection with a neglect proceeding and "knowingly provided false information to ACS." *Emanuel v. Griffin* ("*Emanuel I*"), No. 13 Civ. 1806 (JMF), 2013 WL 5477505, at *5–6, 7 (S.D.N.Y. Oct. 2, 2013). Thus, even taking as true plaintiffs' allegation that Dr. Lupica scurrilously lied about A.K.'s injuries to cover up her failure to diagnose A.K.'s broken femur, that does not show that she acted under color of state law.

Finally, as to Dr. Ranade, plaintiffs argue that her reporting of suspected abuse or neglect, taking of x-rays, and follow-up reports to ACS make her a state actor because she became "part of the reporting and enforcement machinery" of the state. *See* Pl. Opp'n at 24 (quoting *Estiverne v. Esternio-Jenssen* ("*Estiverne II*"), 833 F. Supp. 2d 356, 367–68 (E.D.N.Y. 2011)). For the reasons above, Dr. Ranade's reporting, both before and after August 13, 2018, does not make her a state actor. That is so even though she had multiple contacts with ACS. *See, e.g.*, *Est. of Keenan*, 2019 WL 3410006, at *19 ("Additional input and updates from the Northwell Defendants as CPS's source for medical information regarding Lana's case, which presented a dynamic situation, does not morph the Northwell Defendants from private actors into persons or entities acting under color of state law[.]"). As to Dr. Ranade's admission of A.K. to the E.R. on August 13, 2018, courts have recognized that private medical entities' *detention* of children, for the purposes of conducting abuse investigations, can sometimes amount to

state action. *See, e.g.*, *Kia P. v. McIntyre*, 235 F.3d 749, 756–57 (2d Cir. 2000) (finding state action based on hospital's "discrete and distinguishable role in the complex relationship among the State, the parent and the child in determining the safety and propriety of releasing [a child] to the care of her mother"); *J.C.*, 2007 WL 201163, at *2–3 (discussing *Kia P.* and finding no state action where school reported suspected abuse, but did not detain child). But plaintiffs' § 1983 claims do not focus on A.K.'s brief, August 13, 2018 stay at Mt. Sinai pending ACS's investigation. And even were Dr. Ranade considered a state actor with respect to that isolated incident, that would not convert her other actions—including making reports to ACS—into state action. *See Kia P.*, 235 F.3d at 757 (hospital was state actor only as to period where it lacked medical reason for detaining child). Finally, that Dr. Ranade took unauthorized x-rays on October 4, 2018, allegedly to check for "healing fractures," does not make her a state actor. *See* Am. Compl. ¶ 125. Plaintiffs do not plead that Dr. Ranade ever reported the results of those x-rays to ACS, or that they had anything to do with the removal proceedings that, by then, had been pending for several months.

Nor does the Amended Complaint plausibly allege that the Medical Defendants participated in a § 1983 conspiracy with ACS. *See Ciambriello*, 292 F.3d at 324–25 (private actors may be liable under § 1983 where plaintiffs show "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages"). Plaintiffs rely on the email thread between Glass and Drs. Fabricant, Platt, and Lupica to establish this conspiracy. *See* Pl. Opp'n at 12–14 (discussing Am. Compl. ¶¶ 69–82). But even assuming those communications established an agreement between those individuals to act unlawfully—rather than a conversation in which others were persuaded in good faith by Dr. Lupica's allegedly false claim that her original diagnosis had been correct—plaintiffs do not allege that ACS participated in that discussion. The principal alleged communications between ACS and the Medical Defendants were: (1) the reports of suspected child abuse reviewed above; and (2) the August 30, 2018 meeting between Lawson at ACS and Drs. Ranade, Fabricant, and Lupica. As to the former, such reporting cannot establish a § 1983 conspiracy, even if the reporting were false. *See, e.g.*, *Rodriguez*, 973 F. Supp. 2d at 429 ("[E]ven assuming that Mr. Morrissey had deliberately provided false information to police, such provision alone is not sufficient to form the basis of a conspiracy claim."). As to the latter, the Amended Complaint lacks concrete allegations, beyond the fact of this meeting, to show an agreement

Kurtz v. Hansell, Not Reported in Fed. Supp. (2021)
2021 WL 1143619

Case 5:26-cv-00698-MAD-MJK    Document 5    Filed 04/21/26    Page 46 of 72

between those defendants at any point. Its allegations on this point are conclusory. *See* Am. Compl. ¶ 114 ("Plaintiffs allege that Defendant Lawson was complicit in the 'Weill Cornell/Ranade/HSS conspiracy' " (emphasis removed)). In fact, the only concretely pled communication from ACS to any private defendant is ACS's report to Glass that "there was no reason to remove [A.K.] ... as the [Parents'] story was consistent with injuries as reported by Mt. Sinai." *Id.* ¶ 77. Instead, the Amended Complaint alleges that, after receiving *additional* reports of suspected child abuse, and meeting with the reporting doctors, ACS independently decided to commence removal proceedings. [11] That ACS did so after receiving those reports, even if those reports were false, does not plausibly suggest any conspiracy.

[11]    In opposition, plaintiffs rely on a single case. *See* Pl. Opp'n at 17–19 (discussing *Estiverne II*, 833 F. Supp. 2d at 356–57). But it is far afield. There, plaintiffs sought to hold a single doctor—the head of a hospital's "child protective services team"— liable under § 1983 because she had been "the driving force behind ACS's decision to initiate removal proceedings." *Estiverne II*, 833 F. Supp. 2d at 369–70. The supporting evidence was that the doctor had "recommended removal of [the child], that she diagnosed [the child's] injuries as consistent with being 'grabbed and shaken,' that if she had not made such a diagnosis, Infant Plaintiffs would not have been removed from their home, that ACS always follows the recommendations of [this doctor], and, perhaps most importantly, that ACS made the decision to file a petition 'in unison' with [the doctor] and the [hospital's] Child Protection Team." *Id.* at 369. Here, plaintiffs do not allege, except conclusorily, that any Medical Defendant recommended removal, that ACS "always," or has ever, followed any of their recommendations, or that—aside from the meeting on August 30, 2018—ACS decided to file a removal petition "in unison" with them. In fact, the Amended Complaint alleges that ACS, far from being driven by any Medical Defendant, had a preexisting motive to seek the children's removal. *See* Am. Compl. ¶¶ 110–15. And the removal petition belies that any Medical Defendant urged removal. *See* Petition at 6–7 (basing removal petition solely on medical assessments by Medical Defendants); *see also Estiverne III*, 910 F. Supp. 2d at 444 (finding, after trial, doctor not a state actor because ACS, not she,

decided to petition for removal and doctor provided only medical opinion). *Estiverne* is thus inapposite.

**\*12**    Accordingly, the Amended Complaint does not plausibly allege any Medical Defendant to have been a state actor. The Court thus dismisses the § 1983 claims against these defendants. [12] The Court next turns to plaintiffs' federal claims against persons and entities which undisputedly were state actors.

[12]    Inexplicably, the Amended Complaint also names Dr. Shaykh as a defendant in all six federal claims, even though its only allegation is that he, like Dr. Lupica, failed to diagnose A.K.'s femur fracture. *See* Am. Compl. ¶¶ 36, 287– 301. There is no allegation that Dr. Shaykh ever spoke with anyone at ACS, had any contact with any government official, or took any action conceivably supporting § 1983 liability of any kind. The § 1983 claims against him are also therefore dismissed. The Amended Complaint's grapeshot approach—casting wide claims of illegality well beyond what the facts could remotely bear, as exemplified by the senseless inclusion of Dr. Shaykh as a § 1983 defendant—is regrettable. The Court expects more responsible lawyering as the case moves forward.

#### 2. Malicious Prosecution

To prevail on a § 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted). "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Stampf v. Long Island R.R.*, 761 F.3d 192, 198 (2d Cir. 2014) (quoting *Manganiello*, 612 F.3d at 161). Under § 1983, state "tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements." *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018). A plaintiff must also show "a seizure or other perversion of proper legal procedures implicating [his] personal liberty and privacy interests under the Fourth Amendment." *Id.* at 24

Kurtz v. Hansell, Not Reported in Fed. Supp. (2021)

2021 WL 1143619

(quoting *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004)).

### a. Civil vs. Criminal Proceedings

Most commonly, a claim for malicious prosecution arises from a criminal proceeding. The HSS Defendants thus argue that plaintiffs do not state a claim, because the family court proceeding was civil and plaintiffs have not pled "special damages." *See* HSS Mem. at 19. The Second Circuit has stated, however, that "our case law does not forbid a § 1983 malicious prosecution claim premised on a civil or administrative proceeding." *Washington*, 373 F.3d at 317. To bring a malicious prosecution claim arising from a civil action in general, a plaintiff must make "a showing of some interference with plaintiff's person or property ... by the use of such provisional remedies as arrest, attachment, replevin or injunction, ... or other burden imposed on plaintiff beyond the ordinary burden of defending a law suit." *McCaul v. Ardsley Union Free Sch. Dist.*, No. 11 Civ. 5586 (VB), 2012 WL 1898897, at *3 (S.D.N.Y. May 3, 2012), *aff'd*, 514 F. App'x 1, 4 (2d Cir. 2013) (summary order). Relevant here, the Circuit has noted "that the law in our Circuit is unsettled as to whether child removal proceedings can give rise to a federal claim for malicious prosecution of a parent." *Walker v. City of New York*, 621 F. App'x 74, 76 (2d Cir. 2015) (summary order); *see also McCaul*, 514 F. App'x at 4–5 (discussing without resolving whether neglect proceeding could give rise to a malicious prosecution claim).

**\*13** Absent definitive Circuit guidance, the weight of authority suggests that the removal of a child from her parents, via civil family court proceedings, implicates sufficient constitutional interests to support a malicious prosecution claim. *See, e.g.*, *Cornejo v. Bell*, No. 04 Civ. 341 (BMC), 2008 WL 5743934, at *12 (E.D.N.Y. May 19, 2008) ("[T]he removal of Cornejo's son is sufficient to meet that threshold."), *aff'd*, 592 F.3d 121 (2d Cir. 2010); *Providencia V. v. Schutlze*, No. 02 Civ. 9616 (LTS), 2007 WL 1582996, at *5 n.3 (S.D.N.Y. May 31, 2007) ("[T]he removal of Plaintiffs' son is sufficient to meet the threshold for applicability of this doctrine.") (collecting cases); *Yuan v. Rivera*, 48 F. Supp. 2d 335, 349 (S.D.N.Y. 1999) ("[D]epriving Ms. Chi of the custody of her children for several months reaches this threshold."). *But see Walker v. City of New York*, 63 F. Supp. 3d 301, 317 n.12 (E.D.N.Y. 2014) ("It is likely that no plaintiff in this action can even state a claim for a malicious prosecution as the 'Adult Plaintiffs

have not been seized, and Infant Plaintiffs have not been prosecuted.' " (quoting *Estiverne II*, 833 F. Supp. 2d at 380)). Here, A.K. and M.K. were removed from their parents' custody for more than a month, and the parents' access to their children was highly restricted for eight more months. That impingement is substantial enough to support a claim for malicious prosecution. Accordingly, the Court will not dismiss plaintiffs' § 1983 malicious prosecution claim solely because it arises from a civil proceeding.

### b. Initiation of Proceedings

The Municipal Defendants do not dispute that they initiated proceedings against the parents. They briefly contend that the Amended Complaint erroneously attributes prosecutorial decision-making to Brenda Lawson. City Mem. at 12; City Reply at 9–10. But "individuals other than the agent who actually prosecutes the action can be held liable for malicious prosecution." *Emanuel I*, 2013 WL 5477505, at *7. Such liability can exist when the non-prosecuting individual "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (citation omitted). Here, the Amended Complaint plausibly alleges that Lawson recommended removal and caused the removal action to be commenced. *See, e.g.*, Am. Compl. ¶¶ 101–02, 110–14. Thus, plaintiffs have plausibly pled that she, and potentially other ACS caseworkers, were among those who initiated the proceedings.

### c. Favorable Termination

Under § 1983, unlike New York law, "[p]roceedings are 'terminated in favor of the accused' only when their final disposition is such as to indicate the accused is not guilty." *Lanning*, 908 F.3d at 26 (quoting *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980)). "A termination is not favorable to the accused ... if the charge is withdrawn or the prosecution abandoned pursuant to a compromise with the accused." *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004) (citation omitted).

The Municipal Defendants argue that, because ACS withdrew its petition and the parents consented to that withdrawal, the action was "abandoned pursuant to a compromise," leaving the guilt or innocence undetermined. City Mem. at 9 (citing *Rothstein*, 373 F.3d at 286). In their reply, they also argue

that ACS's withdrawal was in the "interest of justice," and so cannot qualify as favorable termination. *See Lanning*, 908 F.3d at 28–29 ("[W]here a dismissal in the interest of justice 'leaves the question of guilt or innocence unanswered[,] ... it cannot provide the favorable termination required as the basis for [that] claim." (quoting *Hygh v. Jacobs*, 961 F.2d 359, 367–68 (2d Cir. 1992)); *see Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). Plaintiffs respond that, as pled, there was no compromise, and that ACS withdrew its petition because it lacked evidence of liability. The Court holds with plaintiffs.

First, neither the Amended Complaint nor the cognizable records of the family court proceedings reflect any compromise on plaintiffs' part. Rather, as pled, after plaintiffs produced evidence of their innocence of child abuse, *see* Am. Compl. ¶¶ 136–41, and moved for summary judgment, *id.* ¶ 172, and after ACS's own expert concluded that the facts on which the removal petition had been based could not be confirmed, *id.* ¶¶ 174–75, ACS moved to withdraw its case against the parents, with prejudice, *id.* ¶ 176; *see* Del Col Decl., Ex. 2 ("Withdrawal Tr.") at 2–3. In that context, plaintiffs' consent to ACS's dismissal does not bespeak a lack of favorable termination. As pled, plaintiffs could not have received a more favorable resolution. In fact, at the hearing on ACS's petition to withdraw its removal action, its lawyer embraced ACS's experts' conclusion as meriting dismissal. Withdrawal Tr. at 3 ("When we filed this petition we do believe that we had a basis to file, but based on the medical report that was provided to counsel and Your Honor's Court Attorney yesterday, we were able to speak with our independent expert. And after she reviewed all documents we, at this time, do believe that it would be—[t]hat we are asking to withdraw the petition."). These statements show, "in so many words," that plaintiffs were entitled to a dismissal on the merits—not that the withdrawal reflected a compromise or settlement. *McKenzie v. City of New York*, No. 17 Civ. 4899 (PAE), 2019 WL 3288267, at *14 (S.D.N.Y. July 22, 2019); *see Mortimer v. Wilson*, No. 15 Civ. 7186 (KPF), 2020 WL 3791892, at *11 (S.D.N.Y. July 7, 2020) (denying summary judgment to defense where "the dismissal was because the prosecution determined that it would not be able to prove that C.S. was guilty of the charged crimes").

**\*14** Second, the Municipal Defendants rely on *Lanning* to suggest that a "dismissal in the interest of justice ... preclude[s] a finding that the neglect proceeding was 'terminated in Plaintiffs' favor.' " City Reply at 3. But that case is distinct. It involved a procedural dismissal "in the

interest of justice" under N.Y. Crim. Proc. Law § 170.40, which does not apply here. *See Lanning*, 908 F.3d at 23. And although the Municipal Defendants depict plaintiffs as claiming the family court action was dismissed in the "interest of justice," City Reply at 2–3, plaintiffs have not so stated, here or in the cognizable family court records. *See* Withdrawal Tr.; Dkt. 100-21 ("Order of Dismissal"). More fundamentally, *Lanning* declined to find a favorable termination not only because the dismissal arose under section 170.40, but also because, as to some claims, jurisdiction lacked, and as to others, the state court stated that the dismissals were " 'neither an acquittal of the charges nor any determination of the merits,' but rather 'le[ft] a question of guilt or innocence unanswered.' " 908 F.3d at 28. Here, in contrast, the circumstances of ACS's withdrawal reflect plaintiffs' innocence.

### d. Probable Cause

The Municipal Defendants next argue that the existence of probable cause to commence the removal proceeding, and the family court's initial grant of a temporary order of protection removing A.K. and M.K. from the parents' custody, defeats plaintiffs' malicious-prosecution claim. Plaintiffs counter that both decisions—ACS's to begin removal proceedings, and the family court's to grant an order of protection—rested on falsehoods, without which there was not probable cause. Although the question is close, plaintiffs are correct that, on the standards governing a motion to dismiss, the facts do not establish probable cause.

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). "In the context of a malicious prosecution claim, probable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.' " *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (citation omitted). "It is a more exacting standard than the standard required to support an arrest." *Emanuel v. Griffin* ("*Emanuel II*"), No. 13 Civ. 1806 (JMF), 2015 WL 1379007, at *8 (S.D.N.Y. Mar. 25, 2015). However, "[b]ecause obviously less in the way of grounds for belief will be required to justify a reasonable [person] in bringing a civil rather than a criminal suit, when the underlying action is civil in nature[,] the want of probable cause must be patent." *Emanuel I*, 2013 WL 5477505, at *8 (quoting *Fink*

*v. Shawangunk Conservancy, Inc.*, 15 A.D.3d 754, 790 (3d Dep't 2005)).

"[T]he issuance of a temporary injunction or similar judicial recognition of the merit of the underlying case creates a presumption of probable cause and places upon the plaintiff the burden of pleading facts sufficient to overcome it." *Emanuel II*, 2015 WL 1379007, at *9 (quoting *Butler v. Ratner*, 210 A.D.2d 691, 693–94 (3d Dep't 1994)); *see also Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (presumption of probable cause created in criminal case by grand jury indictment). That presumption "is rebuttable, and may be overcome by evidence establishing that the police witnesses 'have not made a complete and full statement of facts ... [,] that they have misrepresented or falsified evidence[,] ... or otherwise acted in bad faith.' " *Boyd*, 336 F.3d at 76 (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82–83 (1983)). But to succeed on a malicious prosecution claim after an indictment or other judicial imprimatur, a plaintiff "must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* (quoting *Colon*, 60 N.Y.2d at 83). In the context of child-removal proceedings specifically, one court has held that the presumption of probable cause arising from a removal order may be rebutted where the petition for removal "was either intentionally or recklessly false, as the result of defendants' conduct." *Estiverne II*, 833 F. Supp. 2d at 379. In assessing probable cause, courts "must consider those facts available to the officer at the time of" her actions. *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).

**\*15** The facts pled and otherwise cognizable here give the Municipal Defendants a solid basis to argue that probable cause existed. As of August 30, 2018, when ACS commenced removal proceedings in family court, it had received two reports of potential child abuse about A.K. As reflected in the Petition, on August 13, 2018, Dr. Ranade had reported that, along with a broken femur, A.K. "presented with injuries to her collarbone," which contradicted the parents' account of how A.K.'s injuries had occurred. Am. Compl. ¶ 105. In addition, around August 30, 2018, Dr. Lupica reported to ACS that, when she had seen A.K. on August 8, 2018, A.K. did not have the femur fracture with which she was ultimately diagnosed, and that, based on the Mt. Sinai and HSS x-rays, she did not believe the injuries occurred in the manner or at the time the parents had claimed. According to the Amended Complaint, Glass and Dr. Fabricant had also contacted ACS caseworkers with similar concerns. *Id.* ¶ 79. After receiving

these reports, on August 30, 2018, ACS commenced removal proceedings. *See* Removal Order at 1–2. That ACS's petition was granted by a family court judge after a hearing also gives rise to a rebuttable presumption of probable cause. *See, e.g.*, *Boyd*, 336 F.3d at 76; *Emanuel II*, 2015 WL 1379007, at *9.

Plaintiffs, however, have pled sufficient facts, at this preliminary stage of the litigation, to rebut that presumption. To do so, plaintiffs must show that the relevant government officials have not made a complete statement of facts, have misrepresented or falsified evidence, or have otherwise acted in bad faith. *Boyd*, 336 F.3d at 76. A showing that defendants' submissions to the family court were "intentionally or recklessly false, as the result of defendants' conduct," can meet this standard. *Estiverne II*, 833 F. Supp. 2d at 379.

Here, although the contrary outcome is entirely possible, plaintiffs have plausibly pled that the Municipal Defendants, in seeking the infants' removal, included materially false statements and were reckless in presenting information to the family court. As plaintiffs emphasize, before August 30, 2018, although ACS did not reveal this to the court, *no* doctor had diagnosed A.K. with a clavicle fracture. Dr. Ranade had affirmatively disavowed a conclusive diagnosis of such a fracture, and Dr. Grimm appears to have concluded that A.K. did not even have a clavicle *injury*. *See* Am. Compl. ¶¶ 105 (Dr. Ranade told ACS that x-rays from August 13, 2018 were "inconclusive."), ¶¶ 108–09 (Dr. Grimm stated on August 14, 2018, that "[a] clavicle fracture has not been confirmed by radiology and when I saw the baby, she lifted both arms spontaneously," and informed ACS's Lawson that she reviewed the x-rays "and saw that both clavicles looked the same."). ACS's notes from August 14, 2018 confirm that a positive diagnosis had not been made. *See id.* ¶ 105. Yet, when ACS filed its removal petition on August 30, 2018, it affirmatively claimed that the August 13, 2018 x-rays had been "inclusive" of clavicle injuries. *Id.*; *see also* Petition at 7. Conceivably, that awkward locution as to this key point could stem from a mere error in typing "inconclusive," but the Court cannot assume this on a motion to dismiss. In any event, plaintiffs plead that, at the hearing on the petition, ACS doubled down on this false claim and represented that A.K. "does have a collarbone fracture," that x-rays had "confirmed the collarbone fracture," and that "[m]ost medical doctor staff were able to take x-rays and were able to see that there was also a collarbone fracture." Am. Compl. ¶ 106. Those statements, as pled, were recklessly false, and had no basis in the records or reports before ACS at the time.

These falsehoods, as pled, were consequential. The Removal Order expressly relied on that aspect of the Petition, citing the presence of *multiple* unexplained injuries as the family court's basis for granting the application. *See* Removal Order at 1. And ACS's own expert, reviewing the same radiological evidence nine months later, ultimately concluded that "no clavicle fracture was identified," proximately leading ACS to withdraw its petition, with prejudice. *Id.* ¶¶ 175–76. To be sure, discovery may well reveal that these were errors made in good faith, or that evidence not now cognizable or apparent buttressed ACS's claim, at the time, of a clavicle fracture. [13] But on a motion to dismiss, the Court must draw all inferences in plaintiffs' favor. *See Koch,* 699 F.3d at 145. Given that standard, the Court cannot find as a matter of law that the Municipal Defendants' decision to initiate removal proceedings, based in significant part on evidence of a clavicle fracture impeached by the medical facts before them, was supported by probable cause and in good faith. [14]

[13] It is possible, too, that, after discovery, the Municipal Defendants will prove entitled to qualified immunity. *See, e.g., Cornejo v. Bell,* 592 F.3d 121, 129 (2d Cir. 2010) (affirming grant of qualified immunity to ACS caseworkers at summary judgment); *Walker,* 621 F. App'x at 76. They did not, however, move to dismiss on this ground. And bad faith, if established, can offset facts that might otherwise warrant a finding of qualified immunity. *See, e.g., Carossia v. City of New York,* 39 A.D.3d 429, 430 (1st Dep't 2007). The Court accordingly does not consider this question at the pleading stage.

[14] Other challenges plaintiffs make to probable cause fare less well. Most significant, they fault the Municipal Defendants for bringing the removal action in the face of Dr. Grimm's assessment that there had not been child abuse. But Dr. Grimm's assessment pre-dated reports of abuse to ACS, including by Dr. Lupica and others, suggesting the parents concealed the true nature and timing of A.K.'s injury. Am. Compl. ¶¶ 64, 79–81, 105. These later reports gave ACS sound reason to reassess its (and Dr. Grimm's) conclusion. *See Id.* ¶¶ 61–67, 77 (noting that, before such reports, ACS had concluded that "there was no reason to remove [A.K.] ... as the [Parents'] story was consistent with injuries as reported by Mt. Sinai"). And contrary to the parents' claim, ACS's decision not to cite Dr.

Grimm's opinion before the family court does not mean that it "suppressed" exculpatory evidence. Plaintiffs do not cite authority that, at any stage of removal proceedings, ACS had a duty to set out for the court all contrary opinions. On the contrary, the Second Circuit has specifically rejected any duty of ACS caseworkers to present exculpatory evidence in family-court proceedings. *See Cornejo v. Bell,* 592 F.3d 121, 129 (2d Cir. 2010) (no constitutional violation where "the heart of the complaint ... is that [ACS] failed to adequately apprise the Family Court of exculpatory information"). Plaintiffs also overreach in claiming that ACS was wrong to rely on Dr. Lupica's assessment, because it, as alleged, was untrue. Unless the Municipal Defendants had a basis to appreciate that Dr. Lupica's account was false, they could consider it in determining whether probable cause supported commencing removal proceedings. *See Simpson v. Town of Warick Police Dep't,* 159 F. Supp. 3d 419, 436–37 (S.D.N.Y. 2016) (collecting cases); *see also Berry v. Marchinkowski,* 137 F. Supp. 3d 495, 527 (S.D.N.Y. 2015) ("Even assuming the version of facts set forth by Plaintiff, that Rose felt coerced and gave false information, this alone does not defeat probable cause to arrest.").

### e. Actual Malice

**\*16** Last, plaintiffs must allege that the defendants acted with "actual malice." *Stampf,* 761 F.3d at 198. That burden is easily satisfied because, at the pleadings stage, "lack of probable cause generally raises an inference of malice." *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 131 (2d Cir. 1997); *see Emanuel I,* 2013 WL 5477505, at \*7. Accordingly, plaintiffs have pled each element of their claim for malicious prosecution. [15]

[15] The Municipal Defendants have not moved specifically as to any individual ACS employees, instead arguing that plaintiffs' claims fail across the board. Thus, although it appears that plaintiffs have pled this claim as to only some subset of those defendants, the Court will not *sua sponte* dismiss this claim as to the others.

### 3. Abuse of Process

2021 WL 1143619

Plaintiffs also allege abuse of process. "In order to state a [§ 1983] claim for abuse of process, a plaintiff must establish that the defendants had an improper purpose in instigating the action ... [and] that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Morales v. City of New York*, 752 F.3d 234, 238 (2d Cir. 2014) (quoting *Savino*, 331 F.3d at 77). Thus, plaintiffs must show that defendants: "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino*, 331 F.3d at 76 (citation omitted).

As with malicious prosecution, the existence of probable cause is a complete defense to an abuse-of-process claim. *See Irish v. City of New York*, No. 09 Civ. 5568 (RMB), 2010 WL 5065896, at *6 (S.D.N.Y. Dec. 6, 2010) ("[T]he presence of probable cause negates a claim for abuse of process." (quoting *Sforza v. City of New York*, No. 07 Civ. 6122 (DLC), 2009 WL 857496, at *17 (S.D.N.Y. Mar. 31, 2009))). And the mere presence of an improper motive in commencing or continuing legal proceedings is insufficient to state a claim for abuse of process; instead, plaintiffs must allege that defendants used legal process to achieve a "collateral objective" outside the aims of that process. *See Savino*, 331 F.3d at 77. Thus, "it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing [a legal action]. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Id.*; *see Brandon v. City of New York*, 705 F. Supp. 2d 261, 275 (S.D.N.Y. 2010) (citing "extortion, blackmail, retribution, or similar extraneous harmful goal" as examples of improper collateral purposes).

In moving to dismiss, the Municipal Defendants argue that they had probable cause to commence the removal proceedings, that abuse-of-process claims cannot arise from civil proceedings, and that plaintiffs have not alleged any collateral objective on their part outside the legitimate ends of the process. The first two arguments largely overlap with arguments the Court has found unavailing in the context of plaintiffs' malicious prosecution claims. But the last, the lack of a collateral objective, is unique to the abuse of process claim. And plaintiffs have not responded to that argument. [16] By failing to do so, plaintiffs have abandoned that claim. *Romeo & Juliette*, 2014 WL 4723299, at *7.

[16]    The only references to abuse of process in plaintiffs' opposition are in two footnotes, in which plaintiffs state that this claim "implicate[s] rights that [are] clearly established under the Constitution" and that it is one of their state-law claims. Pl. Opp'n at 16 n.6, 43 n.15.

 **\*17**  In any event, defendants are right that the Amended Complaint pleads insufficient facts as to a collateral objective on their part. The Amended Complaint alleges that all defendants commenced the family court proceeding "to insulate [defendants] from various levels of civil liability," to "deprive Plaintiffs of their fundamental constitutional protections," and to "financially harm them by draining a substantial part of their personal resources, in order to leverage and otherwise extract a plea/admission and shield themselves from liability." Am. Compl. ¶¶ 229–30. The first of the theories does not sensibly apply to the Municipal Defendants, who, far from deflecting civil liability, exposed themselves to such liability (viz, this lawsuit) by commencing proceedings. And none reach "beyond and in addition to" the removal proceedings themselves. *See, e.g.*, *Moritz v. Town of Warwick*, No. 15 Civ. 5424 (NSR), 2016 WL 3248494, at*5 (S.D.N.Y. June 9, 2016) ("Deprivation of liberty, embarrassment, inconvenience, and legal expenses are direct, rather than collateral, consequences of arrest that are insufficient to support a malicious abuse of process claim."). At best, plaintiffs insinuate improper motives on the part of these defendants (*e.g.*, retaliation for the parents' litigiousness). But "neither retaliation nor a malicious motive ... is a sufficient collateral objective" to state a claim for abuse of process. *Peter L. Hoffman, Lotte, LLC v. Town of Southampton*, 523 F. App'x 770, 771 (2d Cir. 2013) (summary order). Accordingly, the Court dismisses plaintiffs' claim for abuse of process.

### 4. Conspiracy Under §§ 1983 and § 1985

#### a. *Section 1983*

To succeed on a § 1983 claim for conspiracy, a plaintiff must allege: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). A "plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or

tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citation omitted). "Allegations of 'joint conduct' are not sufficient." *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 520 (S.D.N.Y. 2015). Further, a "plaintiff alleging a § 1983 conspiracy must allege a predicate violation of constitutional rights." *Norales v. Acevedo*, No. 20 Civ. 2044 (DLC), 2021 WL 739111, at *10 (S.D.N.Y. Feb. 24, 2021). And "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978).

As discussed above, plaintiffs have failed to plausibly allege a conspiracy between any Medical Defendant and ACS. *See supra* pp. 23–24. Nor, beyond conclusory allegations, do plaintiffs plead a conspiracy within ACS, or with any other state actors. The only alleged state participant in the supposed conspiracy was Lawson, who could not have conspired with herself. And, as stated, even had Lawson agreed with other ACS employees, such could not support a § 1983 conspiracy. *See Herrmann*, 576 F.2d at 459. Accordingly, the Court dismisses plaintiffs' claims of a § 1983 conspiracy against all defendants.

### b. *Section 1985*

To prevail on a conspiracy claim under § 1985, Plaintiffs must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007). It also requires a showing that the conspiracy was "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." *Id.* (citation omitted).

For the reasons above, the Court agrees with the Municipal Defendants that plaintiffs have failed to plausibly allege a conspiracy at all. That alone requires dismissal of this claim. *See, e.g.*, *id.* at 792. Further, as the Municipal Defendants note, plaintiffs have also not alleged that any of the defendants' actions were motivated by a discriminatory animus. Rather, they allege that defendants acted either out of a desire for self-preservation or retaliation. Again, plaintiffs offer no counter to these points. Accordingly, the Court dismisses plaintiffs' § 1985 claim, both because plaintiffs have abandoned it and because it is deficient on the merits. *See Romeo & Juliette*, 2014 WL 4723299, at *7.

### 5. Intentional Deprivation of Constitutional Rights

**\*18** Plaintiffs broadly assert a separate cause of action for "intentional violation of federally protected constitutional rights" against all defendants, accusing all of attempting to interfere with their "rights to effectively and without unnecessary governmental intrusion, parent and otherwise associate with their children." Am. Compl. ¶ 258. Although the Medical Defendants moved to dismiss this claim, the Municipal Defendants appear to have overlooked it. *See generally* City Mem. (seeking dismissal of entire Amended Complaint but failing to address Count Four); City Reply. Without arguments directed to this claim, the Court will not dismiss it *sua sponte*, and, in any event, this claim appears to track (seemingly completely) plaintiffs' claim —which the Court has allowed to proceed against the Municipal Defendants—of malicious prosecution. The Court accordingly does not yet have occasion or cause to dismiss this claim.

### 6. False Imprisonment

Plaintiffs also assert false imprisonment under § 1983. To prevail on that claim, they must plead that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016).

In the Amended Complaint, plaintiffs allege that the "restrictions upon [their] collective liberty to associate with one another constitutes '*confinement*' as a matter of New York

State and Constitutional law." Am. Compl. ¶ 283. They do not cite any authority in support of this broad conception of "confinement," and do not otherwise allege any actual confinement, let alone that A.K. or any other plaintiff was aware of it. *See id.* ¶¶ 281–86. And after defendants each moved to dismiss because of these failures, plaintiffs again did not respond. [17] This claim is therefore also abandoned, and the Court dismisses it. *See Romeo & Juliette,* 2014 WL 4723299, at *7.

[17] Plaintiffs mention this claim twice in their opposition, but only to state that it "implicate[s] rights that [are] clearly established under the Constitution," and that it is among their state-law claims. *See* Pl. Opp'n at 16 n.6, 43 n.15.

### 7. *Monell* Liability

Finally, plaintiffs pursue liability on all the above counts against the City of New York under *Monell,* 436 U.S. 658. Municipal liability in a § 1983 action may not rest on *respondeat superior* or vicarious liability. *Id.* at 691. Instead, to hold a municipality liable under § 1983 for unconstitutional actions of its employees, a plaintiff must prove that there was a municipal policy or custom that directly subjected her to a constitutional violation. *See Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 125 (2d Cir. 2004) ("[C]onstitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation." (citation omitted)).

A plaintiff can establish the existence of a policy or custom by showing:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by

> policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York,* 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted) (collecting cases).

Absent an underlying constitutional violation, the Court need not address municipal liability. *See, e.g., Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006). Accordingly, at the threshold, *Monell* liability cannot obtain for plaintiffs' claims for abuse of process, conspiracy under §§ 1983 and 1985, or false imprisonment. Further, plaintiffs largely base their *Monell* claim on the City's alleged "widespread policy and custom of having doctors and social workers act under the color of law ... and bring the coercive and overwhelming forces of governmental authority to bear on individuals and families without accountability." Am. Compl. ¶ 262. However, the Court has already held that, here, the medical doctors of whom plaintiffs complain are not state actors, and so cannot have been party to any constitutional violations. Plaintiffs' notion that a City policy relating to these professionals—whose reporting is, in fact, required by state law, *see* N.Y. Soc. Serv. Law § 413—could support liability on the part of the City thus fails at the threshold. *See Segal,* 459 F.3d at 219. In any event, plaintiffs do not plausibly allege any such policy. Instead, they merely recite the facts of their own experience with ACS, and conclusorily declare it representative of a broader policy or custom. *See* Am. Compl. ¶¶ 266–71; *e.g., Aragon v. New York,* No. 14 Civ. 9797 (ER), 2017 WL 2703562, at *6 (S.D.N.Y. June 22, 2017) (dismissing *Monell* claim where plaintiffs "allege[d] the existence of a practice adopted by the City solely based on Plaintiff's alleged experience").

**\*19** As to plaintiffs' surviving § 1983 claims, the Amended Complaint alleges only the third basis for *Monell* liability: a consistent and widespread practice, custom, or usage of the City. [18] Where this theory is adequately pled, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryant Cnty. v. Brown,* 520 U.S. 397, 404 (1997).

[18] Plaintiffs' opposition brief also suggests the City may be liable based on a "failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference." Pl. Opp'n at 41 (quoting *Brandon*, 705 F. Supp. 2d at 276–77). But the Amended Complaint does not allege facts supporting this theory of municipal liability. *See* Am. Compl. ¶¶ 261–80; *Cruz v. City of New York*, No. 15 Civ. 2265 (PAE), 2016 WL 234853, at *6 (S.D.N.Y. Jan. 19, 2016) (holding that plaintiffs "cannot add [new theories of *Monell* liability] in an opposition brief" and collecting cases). Similarly, plaintiffs cite cases discussing instances in which "a municipality may be liable for a single incident under proper circumstances," Pl. Opp'n at 40–41 (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986)), but do not explain why such circumstances are present here, let alone identify allegations that support that theory. These theories, too, cannot survive.

Here, plaintiffs allege that it is a "custom and practice" of the City to

> initiate[ ] a removal proceeding on less than probable cause knowing and relying on the fact that for an overwhelming percentage of parents the financial and emotional wherewithal to stand their ground to the bitter end is not possible and that they accept a negotiated plea which, in turn, insulates ACS from liability.

Am. Compl. ¶ 278. Plaintiffs provide one factual datum in support: Iwenofu's statement that, in her 16 years working for ACS, she had never seen a case discharged without "someone taking the blame." *Id.* ¶¶ 129, 279. But that stray observation does not speak to any broader policy of maliciously prosecuting individuals. It says nothing about whether the actions she described were commenced with or without probable cause or malice. And if all those actions, in fact, concluded in a compromise, as Iwenofu's statement implies, none would have terminated in favor of the accused. *See, e.g.*, *Rothstein*, 373 F.3d at 286.

Otherwise, plaintiffs do not cite any facts in support of the existence of this alleged policy. Nor do they allege any prior legal actions involving the same or similar issues, or even any specific family-court proceedings, even if they did not lead to a § 1983 action, that fit the pattern alleged here. *See, e.g.*, *Cruz*, 2016 WL 234853, at *5 (allegations of eight previously settled civil rights actions "fall far short of establishing a custom sufficient to support a *Monell* claim"); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) (dismissing *Monell* claims where plaintiff "does not cite *any* civil cases that implicated the unlawful practice she challenges"); *Tieman v. City of Newburgh*, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (same where plaintiff cited 13 prior cases involving similar allegations, but none had "result[ed] in an adjudication of liability"). Devoid of any concrete factual allegations from which the existence of an unconstitutional municipal policy, custom, or usage that caused plaintiffs' injuries could be inferred, the Amended Complaint fails to state a claim for municipal liability under § 1983. The Court thus dismisses plaintiffs' *Monell* claim against the City. [19]

[19] Plaintiffs also name Hansell, ACS's Commissioner, as a defendant, but only in his official capacity and insofar as he is "the government official whose edicts and acts represent the official policy, practices, customs and regulations of ACS." *See* Am. Compl. ¶ 12. They do not allege his personal involvement in any unconstitutional acts. His dismissal may well be warranted under the same principles discussed above. *See, e.g.*, *D'Alessandro v. City of New York*, 713 F. App'x 1, 10 (2d Cir. 2017). Defendants, however, have not moved to dismiss him from this action based on his lack of personal involvement, and the Court will not do so *sua sponte*.

**\*20** Accordingly, the Court will dismiss all federal claims against the Medical Defendants, because plaintiffs have not plausibly alleged that they were state actors or conspired with state actors in any relevant way. The Court also dismisses plaintiffs' claims against the Municipal Defendants under § 1983 for abuse of process, false imprisonment, and conspiracy, and under § 1985 for conspiracy. However, the Court denies the Municipal Defendants' motion to dismiss plaintiffs' § 1983 claim for malicious prosecution and a violation of their substantive due process rights. As to the

City of New York, however, the Court dismisses those latter claims, as well.

### C. State Claims

#### 1. Supplemental Jurisdiction

Federal district courts have discretion to exercise supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Federal and state law claims are part of the same case or controversy if they share "a common nucleus of operative fact." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997). Claims share such a nucleus if "the facts underlying the federal and state claims substantially overlap or the federal claim necessarily brings the facts underlying the state claim before the court." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006) (cleaned up). Here, plaintiffs bring many state-law claims, some of which overlap nearly entirely with their federal claims, and others of which arise from a common nucleus of operative facts. Accordingly, with one exception discussed below, the Court exercises its supplemental jurisdiction over plaintiffs' state-law claims.

#### 2. Malicious Prosecution

As to the Municipal Defendants, the elements of malicious prosecution under New York law are largely the same as under § 1983, save for the requirement of a constitutional violation. *See Stampf*, 761 F.3d at 198; *see also Lanning*, 908 F.3d at 24–25 (noting that New York law requires a lesser "favorable termination" showing than § 1983 does, as New York law requires only that the termination of the action is "not inconsistent with the Plaintiff's innocence" (citation omitted)). The Court thus denies the Municipal Defendants' motion to dismiss plaintiffs' state-law claim for malicious prosecution for the reasons given above.

Plaintiffs have also named the City of New York in this count. Although § 1983 claims may not be asserted based on a theory of *respondeat superior*, New York law does provide for vicarious liability in some circumstances. *See, e.g.*, *Velez v. City of New York*, 730 F.3d 128, 136–37 (2d Cir. 2013); *Biswas v. City of New York*, 973 F. Supp. 2d 504, 539–40

(S.D.N.Y. 2013); *Swierczynski v. O'Neill*, 41 A.D.3d 1145, 1146 (4th Dep't 2007). The Municipal Defendants have not addressed this point. The Court accordingly leaves standing the state-law claim for malicious prosecution against the City.

As to the Medical Defendants, the question is more complex. To state a claim for malicious prosecution under New York law, a plaintiff must allege "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Stampf*, 761 F.3d at 198. As under § 1983, such claims, under New York law, can arise out of civil proceedings. *See, e.g.*, *Perryman v. Village of Saranac Lake*, 41 A.D.3d 1080, 1081 (3d Dep't 2007). Unlike under § 1983, however, New York law authorizes claims for malicious prosecution against private individuals, even if not state actors, where they "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman*, 215 F.3d at 217 (quoting *DeFilippo v. County of Nassau*, 183 A.D.2d 695, 696 (2d Dep't 1992)).

**\*21** The Medical Defendants argue, *inter alia*, that plaintiffs' state-law claim for malicious prosecution against them fails because ACS, not they, initiated the removal proceeding. As to most such defendants, the Court agrees. Under New York law, "[t]he mere reporting of a crime to police and giving testimony are insufficient" to establish liability for malicious prosecution. *Estiverne v. Esernio-Jenssen* ("*Estiverne I*"), 581 F. Supp. 2d 335, 348 (E.D.N.Y. 2008) (quoting *Present v. Avon Prods., Inc.*, 253 A.D.2d 183, 189 (1st Dep't 1999)). That applies even if a defendant gave "false information to the authorities." *Id.* (quoting *Lupski v. County of Nassau*, 32 A.D.3d 997, 998 (2d Dep't 2006)). A private individual who falsely reports to the authorities can be held responsible for initiating a prosecution only upon a "showing that, at the time the information was provided, the defendant knew it to be false." *Id.*

Largely for the reasons given above in explaining why such private reporters are not state actors, the Court holds that plaintiffs have not plausibly alleged that Dr. Ranade, Dr. Fabricant, Dr. Platt, Dr. Shaykh, or Glass played an active role in the removal proceedings, either by encouraging or advising ACS to act. Rather, setting aside the Amended Complaint's speculative and conclusory allegations, plaintiffs allege only that these defendants reported suspected child abuse to ACS, as they were required to do by N.Y. Soc. Serv. Law § 413.

Case 5:26-cv-00698-MAD-MJK    Document 5    Filed 04/21/26    Page 56 of 72

Dr. Ranade had examined A.K. and observed both a femur fracture and potentially injured clavicle, and reported such observations to ACS—tempering her assessment by noting that she could not confirm a clavicle fracture. *See* Am. Compl. ¶ 105. Dr. Fabricant and Glass may have repeated Dr. Lupica's story to ACS but, even assuming that story was false, plaintiffs have not plausibly alleged that these defendants knew it to be so at the time. And Dr. Platt and Dr. Shaykh are not alleged to have ever contacted ACS. Accordingly, plaintiffs have not plausibly alleged that any of these defendants initiated the removal proceedings. The Court grants their motions to dismiss the state-law claims for malicious prosecution against them. [20]

[20] Although the above reasoning independently requires dismissal, these defendants are also protected by N.Y. Soc. Serv. Law § 419, which confers immunity against state-law liability for the mandatory reporting of suspected child abuse or neglect, absent "willful misconduct or gross negligence." *Isabelle V. v. City of New York,* 150 A.D.2d 312, 313 (1st Dep't 1989). Thus, "[m]andated reporters need not await conclusive evidence of abuse or maltreatment but must act on their reasonable suspicions[,] and the law allows them a degree of latitude to err on the side of protecting children who may be suffering from abuse." *Id.* Because plaintiffs have not plausibly alleged willful misconduct or gross negligence by these doctors, and have pled that A.K. presented with severe injuries, these defendants, even taking plaintiffs' non-conclusory allegations as true, acted reasonably in the situation, triggering immunity under section 419.

As to Dr. Lupica, however, the analysis differs. The Amended Complaint plausibly alleges that her reports, both to the other private individuals on the August 27–30, 2018 email chain and to an ACS caseworker, were *deliberately* false. *See supra* pp. 20–21. It alleges that, once confronted with her failure to diagnose A.K.'s broken femur, she declared that there was "no way" that A.K. had that injury at the time of her initial examination. *See* Am. Compl. ¶¶ 74–75. And it alleges that Dr. Lupica, apparently to enhance the credibility of her false statement, further falsely claimed to have examined—or at least been in the presence of—A.K. for four hours, rather than the five minutes that she actually spent with A.K. The Amended Complaint further alleges that Dr. Lupica, in an error that exposed her unfamiliarity with

A.K., misidentified A.K. as male. *Id.* Such allegations are enough to push plaintiffs' claim of Dr. Lupica's deliberate lying from merely conceivable to plausible. *See Iqbal,* 556 U.S. at 678. [21]

[21] In their reply, the Weill Cornell defendants argue that Dr. Lupica was correct in late-August 2018, and that A.K. did not, in fact, have the alleged femur fracture when she appeared at Weill Cornell on August 8, 2018. *See* Weill Cornell Reply at 8–9. That is of course possible. And the discovery that will now commence will, of necessity, give the surviving defendants a fulsome opportunity to test whether Dr. Lupica's or the parents' version of events on August 8–9, 2018, is true, and whether Dr. Lupica had a good-faith basis to make the claims that she did. But at this stage of the litigation, where the Court's review is limited to the pleadings, the Court must credit the well-pled allegations in the Amended Complaint.

**\*22** Accepting that allegation as true, plaintiffs have plausibly asserted a claim under New York law for malicious prosecution against Dr. Lupica. A private defendant can "initiate" a prosecution by giving false information to the authorities if "at the time the information was provided, the defendant knew it to be false." *Lupski,* 32 A.D.3d at 998; *see Emanuel I,* 2013 WL 5477505, at *7; *Estiverne I,* 581 F. Supp. 2d at 347–49. Here, the Amended Complaint so alleges as to Dr. Lupica. It alleges that, on the day that ACS commenced removal proceedings against plaintiffs, Dr. Lupica contacted ACS to falsely report child abuse, knowing her report was false. *See* Am. Compl. ¶¶ 75, 81. Those facts plausibly assign her an "active role" in the initiation of the removal proceedings. *Rohman,* 215 F.3d at 217. The Amended Complaint also pleads the other elements of this tort as to Dr. Lupica. The removal proceedings terminated in the parents' favor. *See supra* pp. 28–29. And assuming that the content of Dr. Lupica's report to ACS was false, plaintiffs have pled a lack of probable cause to so report. *See, e.g.,* *Emanuel I,* 2013 WL 5477505, at *7. Last, because the "lack of probable cause generally raises an inference of malice," *Ricciuti,* 124 F.3d at 131, plaintiffs have also plausibly alleged malice. [22]

[22] Dr. Lupica argues that she is immune under N.Y. Soc. Serv. Law § 419. *See* Weill Cornell Mem. at 13–14. But section 419 does not apply to instances of "willful misconduct" or "gross negligence," as

is plausibly alleged here. *Isabelle V.*, 150 A.D.2d at 313.

Accordingly, the Court denies Dr. Lupica's motion to dismiss this claim. Because New York law, unlike § 1983, recognizes vicarious liability for employers in some circumstances, *see Velez*, 730 F.3d at 136–37, and the Weill Cornell Defendants have not offered any counter on this point, the Court also denies the motion to dismiss the claim against Weill Cornell. As to all other Medical Defendants, this claim is dismissed.

### 3. Abuse of Process

Plaintiffs' claim for abuse of process under New York law is governed by the same standards as their claim under § 1983. *See Savino*, 331 F.3d at 76. For the same reasons given above in connection with the § 1983 abuse-of-process claim —that plaintiffs have abandoned this claim and also failed to plausibly allege a collateral objective by any defendant— the Court dismisses this claim. As to the latter point, insofar as plaintiffs allege false reporting by Medical Defendants such as Dr. Lupica, "courts have dismissed abuse of process claims for [lack of an ulterior motive] where" individuals "allegedly filed false allegations of abuse and harassment to obtain a protective order" against an individual, where the "ulterior and illegitimate" purpose identified was to harass a family member. *Silver v. Kuehbeck*, 217 F. App'x 18, 21 (2d Cir. 2007) (summary order). Even there, "the falsity of the allegations and defendant's malicious motive in making them do not, of themselves, give rise to a cause of action for abuse of process." *Id.* (quoting *Butler v. Ratner*, 210 A.D.2d 691, 692 (3d Dep't 1994)). Plaintiffs thus have not plausibly alleged abuse of process against any defendants under state law.

### 4. False Imprisonment

Plaintiffs' claim for false imprisonment under state law similarly tracks their § 1983 claim for false imprisonment. *See* Am. Compl. ¶¶ 281–86. For the reasons above, the Amended Complaint does not state a claim for false imprisonment based on the removal of A.K. and M.K. from the parents' custody; and plaintiffs, in any event, have abandoned this claim. The Court dismisses the state-law claim for false imprisonment.

### 5. Intentional Infliction of Emotional Distress

"Under New York law, a claim for intentional infliction of emotional distress must satisfy an 'exceedingly high legal standard.' " *DiRuzza v. Lanza*, 685 F. App'x 34, 36 (2d Cir. 2017) (summary order) (quoting *Chanko v. Am. Broad. Cos. Inc.*, 27 N.Y.3d 46, 57 (2016)). First, the tort "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (citation omitted). Second, a party alleging IIED must plead conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Chanko*, 27 N.Y.3d at 56 (citation omitted). The time to bring a claim for IIED, as with most other intentional torts, is one year from the alleged actions giving rise to the claim. *See, e.g.*, *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 491 (2007) (citing N.Y. C.P.L.R. § 215).

**\*23** Here, plaintiffs argue that the Medical Defendants' false reporting, and ACS's malicious prosecution of the removal proceeding, constitutes IIED. The Medical Defendants all argue that plaintiffs' IIED claim is time-barred because plaintiffs filed this action more than one year after the last of their alleged actions or communications with ACS took place. They are correct. Plaintiffs filed this action on May 1, 2020. *See* Dkt. 1. A timely claim for IIED thus must arise from actions on or after May 1, 2019. But the last alleged action by any Medical Defendant was Dr. Ranade's October 4, 2018 unauthorized x-rays of A.K. Am. Compl. ¶ 125; *see also id.* ¶ 29 (describing September 10, 2018 report to ACS that parents brought A.K. to see Dr. Ranade unaccompanied). And the last alleged acts by Dr. Lupica, Dr. Fabricant, Dr. Platt, Dr. Shaykh, and Glass occurred earlier, in August 2018. *See, e.g.*, *id.* ¶¶ 72–83. New York courts have specifically held that, for IIED claims based on false reporting to ACS, such claims accrue on the date of the false report, even where the resulting removal of a child takes place later on. *See, e.g.*, *Williams v. Georgopoulos*, 184 A.D.3d 608, 609 (2d Dep't 2020) (collecting cases). Accordingly, no acts on which the IIED claim against the Medical Defendants is based took place within the one-year statute of limitations set by N.Y. C.P.L.R. § 215. That forecloses plaintiffs' IIED claim against the Medical Defendants. [23]

Kurtz v. Hansell, Not Reported in Fed. Supp. (2021)

2021 WL 1143619

23    Plaintiffs argue, summarily in a footnote, that the Medical Defendants' conspiracy with ACS makes their claim timely. *See* Pl. Opp'n at 46 n.16. They do not cite authority for that notion. And, as held above, the Amended Complaint does not plausibly allege any such conspiracy.

As to the Municipal Defendants, their actions arguably continued into May 2019, when they ultimately withdrew the removal Petition. Perhaps for this reason, they do not move on the basis of the statute of limitations. But dismissal of this claim against the Municipal Defendants is required for an independent reason. As defendants rightly argue, a "cause of action alleging intentional infliction of emotional distress should [be] dismissed as duplicative of [a] cause[ ] of action alleging malicious prosecution." *Leonard v. Reinhardt,* 20 A.D.3d 510, 510 (2d Dep't 2005) (collecting cases). Because IIED "may be invoked only as a last resort," where alleged conduct "falls well within the ambit of other traditional tort liability," IIED claims generally are to be dismissed. *Salmon,* 802 F.3d at 256; *see id.* at 257 ("[B]ecause other tort remedies were available to Salmon, the district court correctly dismissed his intentional infliction claim."); *see also Shaheed v. City of New York,* 287 F. Supp. 3d 438, 455 (S.D.N.Y. 2018) (citing malicious prosecution as one such tort, and dismissing IIED claim because injuries were not "irremediable through traditional tort remedies"), *aff'd sub nom. Shaheed v. Kroski,* 833 F. App'x 868 (2d Cir. 2020); *Leonard,* 20 A.D.3d at 510 (same). Here, as the Court has held, ACS's decision to pursue removal proceedings, to the extent it may be found outrageous or intolerable, is redressable within the framework of the familiar tort of malicious prosecution. Indeed, the facts that the Amended Complaint relies on in claiming IIED almost entirely repeat those offered in support of their malicious prosecution claim. *See* Pl. Opp'n at 46 ("ACS, therefore, acting in concert with the members of the Weil Cornell/Ranade/HSS Conspiracy both ignored significant exculpatory evidence and manufactured a false or reckless diagnosis." (footnote omitted)). *Compare* Am. Compl. ¶¶ 191–226 (malicious prosecution), *with id.* ¶¶ 322–30 (IIED). Accordingly, the Court dismisses plaintiffs' IIED claim against the Municipal Defendants, as duplicative of their malicious prosecution claim against those defendants.

### 6. Loss of Consortium and Companionship

All defendants have moved to dismiss plaintiffs' claims for loss of consortium and loss of companionship, on several grounds. Plaintiffs have not responded. This claim is abandoned, and the Court dismisses it. *See Romeo & Juliette,* 2014 WL 4723299, at *7.

### 7. Medical Malpractice

Plaintiffs bring two claims for medical malpractice: (1) against Dr. Lupica, Dr. Shaykh, and Weill Cornell for allegedly failing to diagnose A.K.'s broken femur on August 8, 2018; and (2) against Dr. Ranade, for allegedly taking unauthorized x-rays of A.K., without informed consent, on October 4, 2018. *See* Am. Compl. ¶¶ 287–315. Those defendants each move to dismiss those claims against them.

**\*24** The Court denies the Weill Cornell Defendants' motion. They first argue that, because A.K. promptly received proper treatment for her fracture at Mt. Sinai, "any claim for purported malpractice is limited to treatment over the course of less than 24 hours." Weill Cornell Mem. at 22. Although that fact bears on the damages available to plaintiffs, it does not defeat the claim that defendants "deviat[ed] from accepted medical standards" in examining A.K. at the outset of her care. *E.g., Gold v. Hershey,* 90 A.D.2d 704, 705 (1st Dep't 1982). Second, they argue that the Court should exercise its discretion to decline supplemental jurisdiction over this claim. But Weill Cornell's August 8, 2018 examination of A.K. is interwoven with other issues in this case—including whether Dr. Lupica truthfully reported her assessment that night. And other claims implicating these events, against both Dr. Lupica and others, are proceeding to discovery. Absent "exceptional circumstances" or "other compelling reasons for declining jurisdiction," the Court will not decline supplemental jurisdiction over this claim. 28 U.S.C. § 1367(c)(4).

As to the claim against Dr. Ranade, however, the Court declines to exercise such jurisdiction. *See* Mt. Sinai Mem. at 19. The Court has dismissed all other claims against Dr. Ranade. And Dr. Ranade's October 4, 2018 x-rays, which she took months after the removal proceedings commenced and never allegedly relayed to ACS or anyone else, are unrelated to any of plaintiffs' surviving claims against any remaining defendants. The Court dismisses this claim, without prejudice to plaintiffs' right to pursue it in state court.

### 8. Defamation

Last, plaintiffs bring a claim for defamation, solely against Dr. Ranade, Dr. Platt, and Glass. In support, they cite (1) Dr. Platt's emailed statements, on August 27–30, 2018, that the parents were "dangerous" and that she could not "imagine how ACS released this vulnerable infant to the family," Am. Compl. ¶¶ 376–78; (2) Dr. Ranade's reports to ACS of suspected child abuse or neglect, *id.* ¶¶ 379–81; and that Glass "reiterated and repeated" the claim that the parents were "dangerous," *id.* ¶ 382.

Defendants argue that these claims are time-barred. Plaintiffs have not responded. The Court holds with defendants. Under New York law, an action for defamation or slander must "be commenced within one year of the publication or utterance of the defamatory statement," and "[d]iscovery does not extend the one-year period." *Frederick v. Fried*, 10 A.D.3d 444, 445 (2d Dep't 2004) (collecting cases). Plaintiffs filed this action on May 1, 2020, meaning that only statements on or after May 1, 2019 may be actionable. *See id.* All of Glass's, Dr. Platt's, and Dr. Ranade's allegedly defamatory statements occurred between August and October 2018. Accordingly, plaintiffs' claim for defamation is dismissed as untimely.

### CONCLUSION

For the foregoing reasons, the Court rules as follows on the motions to dismiss.

The Court grants in full the motions to dismiss by the HSS Defendants and the Mt. Sinai Defendants.

The Court grants in part and denies in part the motion by the Municipal Defendants. The Court dismisses all claims against the Division of Child Protection, ACS, and the New York Comptroller, and all federal claims against the City of New York. The Court also dismisses plaintiffs' claims for abuse of process under federal and state law, false imprisonment under federal and state law, conspiracy under §§ 1983 and 1985, loss of companionship and consortium under state law, and IIED under state law, against all Municipal Defendants. However, the Court denies the Municipal Defendants' motion as to plaintiffs' claims (1) for malicious prosecution, under federal and state law, as alleged against the individual Municipal Defendants; (2) for violation of plaintiffs' right to

family integrity under 42 U.S.C. § 1983, as alleged against the individual Municipal Defendants; and (3) for malicious prosecution, only under state law, as alleged against the City of New York.

Finally, the Court grants in part and denies in part the motion by the Weill Cornell Defendants. The Court dismisses all federal claims against those defendants, as well as the state-law claims against them for false imprisonment, abuse of process, loss of consortium and companionship, IIED, and defamation. The Court also dismisses all other claims against Dr. Platt, and the state-law malicious prosecution claim against Dr. Shaykh. The Court, however, denies the motion to dismiss plaintiffs' claims (1) against Dr. Lupica and Weill Cornell for malicious prosecution under state law; and (2) against Dr. Lupica, Dr. Shaykh, and Weill Cornell for failure to diagnose.

**\*25** Accordingly, this case will proceed solely as to the following claims: (1) malicious prosecution under § 1983 against the individual Municipal Defendants; (2) violation of the family's substantive due process rights under § 1983 against the individual Municipal Defendants; (3) malicious prosecution under state law against the individual Municipal Defendants, the City of New York, Dr. Lupica, and Weill Cornell; and (4) failure to diagnose against Dr. Lupica, Dr. Shaykh, and Weill Cornell.

The Clerk of Court is respectfully directed to terminate as parties to this case defendants Dr. Sheena Ranade, Mt. Sinai Hospital, Dr. Peter Fabricant, LSW Karen Glass, the Division of Child Protection, the New York Comptroller, and the Administration for Children's Services. The Clerk of Court is further directed to terminate the motions pending at dockets 89, 93, 99, and 112.

An order scheduling an initial conference in this case will issue shortly.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1143619

---

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (6)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Verified Complaint and Jury Demand**<br>Shveta Kakar KURTZ, Daniel L. Kurtz, Amna Kakar Kurtz (A Minor Child), Mia Kakar Kurtz (A Minor Child), Plaintiffs, v. David HANSELL, as the Duly Appointed Commissioner of the New York City Administration for Children's Services, The Division of Child Protection, The City of New York, Yscary Rodriguez, Individually and as a Caseworker employed by ACS, "Ms. Bhojranie Maygoo," Individually and as a Caseworker employed by Acs, Eunice Iwenofu, Individually and as a Caseworker employed by Acs, Brenda Lawson, Individually and as an ACS Case Manager/Supervisor, Esperanza Sandoval, Individually and as a Supervisor in the Family Support Unit employed by ACS, Dr. Peter Fabricant, Individually and as a Treating Physician and State Actor Operating Under Color of Law, Dr. Marie Lupica, as an Individual, Treating Physician and State Actor Operating Under Color of Law, Dr. Ramzi Marwan Shaykh, Individually and as a Treating Physician, Dr. Shari L. Platt, as an Individual and as a Treating Physician and State Actor Operating Under Color of Law, Dr. Sheena Ranade, as an Individual, as a Treating Physician, and as an Individual Acting Under Color of Law, LSW Karen Glass, as an Individual and as a State Actor, Unnamed ACS Workers and Employees 1-10, Unnamed Employees and Workers of New York-Presbyterian Hospital/Weill Cornell Medical Center 1-10, Unnamed Workers and Employees of Mt. Sinai Hospital 1-10, and New York-Presbyterian Hospital/Weill-Cornell Medical Center., Defendants.<br>2020 WL 13856900 | — | S.D.N.Y. | May 01, 2020 | Pleading |

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **2. Medical Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment**<br>Shveta Kakar KURTZ, Daniel L. Kurtz, Amna Kakar Kurtz (A Minor Child), Mia Kakar Kurtz (A Minor Child), Plaintiffs, v. David HANSELL, as the Duly Appointed Commissioner of the New York Administration for Children's Services, The Division of Child Protection, Administration for Children's Services, Mt. Sinai Hospital, New York Comptroller, The City of New York, Yscary Rodriguez, Individually and as a Caseworker employed by ACS, "Ms. Bhojranie Maygoo", Individually and as a Caseworker employed by ACS, Eunice Iwenofu, Individually and as a Caseworker employed by ACS, Brenda Lawson, Individually and as an ACS Case Manager/Supervisor, Esperanza Sandoval, Individually and as a Supervisor in the Family Support Unit employed by ACS, Dr. Peter Fabricant, Individually and as a Treating Physician and State Actor Operating Under Color of Law, Dr. Marie Lupica, as an Individual, Treating Physician and State Actor Operating Under Color of Law, Dr. Ramzi Marwan Shaykh, Individually and as a Treating Physician, Dr. Shari L. Platt, as an Individual and as a Treating Physician and State Actor Operating Under Color of Law, Dr. Sheena Ranade, as an Individual, as a Treating Physician, and as an Individual Acting Under Color of Law, LSW Karen Glass, as an Individual and as a State Actor, Unnamed ACS Workers and Employees 1-10, Unnamed Employees and Workers of New York-Presbyterian Hospital/ Weill Cornell Medical Center 1-10, Unnamed Workers and Employees of Mt. Sinai Hospital 1-10, and New York-Presbyterian Hospital/Weill-Cornell Medical Center, Defendants.<br>2022 WL 20717162 | — | S.D.N.Y. | Aug. 19, 2022 | Motion |
| **3. 2023 WL 7544216**<br>A.K. v. Lupica et al.<br>2023 WL 7544216 | — | S.D.N.Y. | July 13, 2023 | Jury Verdict |
| **4. Judgment**<br>Shveta Kakar KURTZ, et al., Plaintiffs, v. Dr. Marie LUPICA, et al., Defendants.<br>2023 WL 6367915 | — | S.D.N.Y. | Sep. 27, 2023 | Jury Verdict |
| **5. Verdict Form**<br>Shveta Kakar KURTZ, Daniel L. Kurtz, solely in their roles as parent-guardians, and Amna Kakar Kurtz, Plaintiffs, v. Dr. Marie LUPICA and New York Presbyterian Hospital/ Weill-Cornell Medical Center, Defendants.<br>2023 WL 6367912 | — | S.D.N.Y. | July 13, 2023 | Jury Verdict |
| **6. Docket 1:20-CV-03401**<br>Kakar Kurtz et al v. Hansell et al | — | S.D.N.Y. | May 01, 2020 | Docket |

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (4)**

**Direct History (1)**

1.  Kurtz v. Hansell
2021 WL 1143619 , S.D.N.Y. , Mar. 24, 2021

**Related References (3)**

2.  Kurtz v. Hansell
664 F.Supp.3d 438 , S.D.N.Y. , Mar. 27, 2023

*Affirmed by*

3.  Kakar Kurtz v. Lawson
2025 WL 39860 , 2nd Cir.(N.Y.) , Jan. 07, 2025

4.  Kurtz v. Lupica
2023 WL 3510646 , S.D.N.Y. , Apr. 26, 2023

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Cole v. Smrtic, Not Reported in Fed. Supp. (2024)

2024 WL 4870495

2024 WL 4870495
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Matthew H. COLE, Plaintiff,
v.
Honorable Michael W. SMRTIC, et al. Defendants.

No. 1:24-CV-00847 (MAD/CFH)
|
Signed November 21, 2024

**Attorneys and Law Firms**

MATTHEW H. COLE, 271 Market Street, Amsterdam, New York 12010, Plaintiff pro se.

### REPORT-RECOMMENDATION & ORDER

CHRISTIAN F. HUMMEL, United States Magistrate Judge

### I. In Forma Pauperis

**\*1** Plaintiff pro se Matthew H. Cole ("plaintiff") commenced this action (No. 1:24-CV-00623) on May 6, 2024, by filing a complaint. See Dkt. No. 1 ("Compl."). On September 26, 2024, plaintiff submitted what the Court construes to be a supplement to the complaint. [1] See Dkt. No. 7. In lieu of paying this Court's filing fees, he submitted an application for leave to proceed in forma pauperis ("IFP"). See Dkt. No. 2. The undersigned has reviewed plaintiff's IFP application and determines that he financially qualifies to proceed IFP. [2] Thus, the Court proceeds to its review of the complaint pursuant to 28 U.S.C. § 1915. Plaintiff has also submitted for the Court's review a Pro Se Application for Permission to File Electronically and a Motion to Appoint Counsel. See Dkt. Nos. 4, 5.

[1] The submission includes a letter addressed to District Judge D'Agostino, titled, "Requirements for Cases Removed From State Court," Dkt. No. 7; a receipt from Montgomery County Clerk dated December 8, 2022; and a "Notice of Claim" with the caption of Cole v. County of Montgomery, dated December 7, 2022. See Dkt. No. 7. The undersigned has reviewed this submission in connection with the initial review of plaintiff's

complaint. See Sira v. Morton, 380 F. 3d 57, 67 (2d Cir. 2004).

[2] Plaintiff is advised that, although he has been granted IFP status, he is still required to pay all fees and costs he may incur in this action, including, but not limited to, copying fees, transcript fees, and witness fees.

### II. Initial Review

#### A. Legal Standards

Section 1915 of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, it is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action.

Where, as here, the plaintiff proceeds pro se, "the court must construe his submissions liberally and interpret them to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (internal quotation marks omitted); see also Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994). As the Second Circuit stated,

> There are many cases in which we have said that a pro se litigant is entitled to "special solicitude," that a pro se litigant's submissions must be construed "liberally," and that such submissions must be read to raise the strongest arguments that they "suggest[.]" At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, or arguments that the submissions themselves do not "suggest," that we should not "excuse frivolous or vexatious filings by pro se litigants," and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law[.]"

**\*2** Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006) (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

"The [Second Circuit]'s 'special solicitude' for pro se pleadings has its limits, because pro se pleadings still must comply with ... the Federal Rules of Civil Procedure [('Fed. R. Civ. P.')]." Kastner v. Tri State Eye, No. 19-CV-10668 (CM), 2019 WL 6841952, at *2 (S.D.N.Y. Dec. 13, 2019) (quoting Ruotolo v. IRS, 28 F.3d 6, 8 (2d Cir. 1994)). Pleading guidelines are provided in the Federal Rules of Civil Procedure. Specifically, Rule 8 requires the pleading to include:

(1) a short and plain statement of the grounds for the court's jurisdiction ...;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought...

FED. R. CIV. P. 8(a). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal. Sheehy v. Brown, 335 F. App'x 102, 104 (2d Cir. 2009) (summary order).

Further, Fed. R. Civ. P. 10 provides:

[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 54 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too a heavy burden in terms of a defendant's duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). As the Second Circuit has held, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citations omitted).

**\*3** This Court also has an overarching obligation to determine that a claim is not legally frivolous before permitting a pro se plaintiff's complaint to proceed. See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp., 221 F.3d 362, 363 (2d Cir. 2000). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " Aguilar v. United States, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999)[3] (quoting Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998)); see also Neitzke v. Williams, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis.").

[3] Any unpublished cases cited within this Report-Recommendation & Order have been provided to plaintiff.

### B. Complaint

Plaintiff's civil cover sheet indicates that he seeks to bring this action pursuant to "Title U.S.C. 18 Section 241, Conspiracy Against Rights & Title U.S.C. 18 Section 242 Deprivation of rights Under Color of Law." Dkt. No. 1-1 at 1. The civil cover sheet further provides that his cause of action involves, "Violation of Due process, Speedy Trial Rights, Ineffective Assistance of Counsel. I feel I am being targeted for being black and gay." Id.

Plaintiff's form complaint checks the box indicating that he seeks to bring this case pursuant to 42 U.S.C. § 1983.

Cole v. Smrtic, Not Reported in Fed. Supp. (2024)

2024 WL 4870495

See Compl. at 3. In response to the question in the form complaint asking in "what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials," plaintiff responds, "Due Process, 30.30 Speedy Trial Violation, Ineffective Assistance of counsel." [4] Id. In response to a question asking him to explain "how each defendant acted under color of state or local law," plaintiff states "Each judge deliberately denied me due process, and refused to look into the paperwork to see that i was improperly denied my speedy trial rights. It was a tean [sic] effort. The ADA/Special Prosecutor withheld potential exculpatory material which was usd [sic] against me. All mentioned actions were done and upheld even after I showed federal law with supportive case law as a pro se litigant." Id.

[4]     Although plaintiff generally references ineffective assistance of counsel, Compl. at 4, he does not name any attorney who may have represented him. Any claims against the prosecutor would not be considered ineffective assistance of counsel because Mr. Maxwell, as the prosecutor, was not plaintiff's attorney.

Plaintiff provides that his "case is still on appeakl [sic] in Appellate Court Third Department. I feel they are guilty, or part of what I call a scandal. I went to them from the very start with a complaint to the grievance committee, where they denied any wrongdoing. It must be ok to violate Constitutional rights there. This is from March 2019 to present" Id.

In response to a question that asks plaintiff to state the facts underlying his claims, plaintiff states, "Please see attached Article 78 that is attached. It was dismissed being in the wrong court, but is on point." Id. at 4. Plaintiff did not provide the Court with any such attachment and has not submitted any Article 78 materials. See Compl., Dkt. No. 7.

In response to the form complaint's question asking about any injuries suffered as a result of the conduct he complains of, plaintiff states, "Sever [sic] depression over 20 years, irreperable [sic] harm, defamation of charcter [sic] by arguments not legally allowed to give. Loss of income, inability to gain and keep employment, mental trauma, instilled disbelief in justice in the legal system, familial traumam [sic] due to my legal battles." Id. Indicating the relief sought, plaintiff states

 *4     Petitioner seeks reinstatement of driving priveldges [sic], and 10 million dollars for damages caused by conflict of interest, deliberate violation of Due Process, Speedy Trial rights, Ineffective assistance of counsel, malice, Brady Violation, Petitioner claims deliberate misconduct and malice in Montgomery County Court, the Saratoga Disrict Attorney's Office, and the Supreme Court Appellate Division Third department. ** This is subject to change if an attorney agrees to represent.

Compl. at 5. Although he typed his name, plaintiff does not sign the complaint where a signature is indicated. See id. at 8.

Plaintiff provides in his supplement that he "removed this action to district court asserting jurisdiction pursuant to 42 U.S.C. 1983, and § 1441." Dkt. No. 7. at 1. Plaintiff states that he removed this case from Montgomery County Supreme Court. See id. He states that he seeks or sought the removal because he was told he was "not guarantee counsel" at the state, but that "[i]n Federal Court, there is that option, pending qualification, and I am told, if a lawyer agrees to take it, then I really have something. I am in dire need of counsel." Id.

Plaintiff states, "[t]he ineffective assistance of counsel and The County Court are a matter already mentioned in the appeal." Dkt. No. 7 at 2. Plaintiff states that "[t]o get my conviction, I allege judicial and prosecutorial misconduct, and ineffective assistance of counsel × 4. That is why I am pro se. I had to protect myself when appointed counsel did not. It also went through a couple judges which is why they are mentioned in the preliminary complaint/paperwork, and why I mention bias." Id. Plaintiff states he can "prove each thing I saw not just with my words, but with transcripts [5] from the County Court, and the Adult Drug Court." Id. Plaintiff refers to being drug free for four and a half years and having academic success in college. Id. at 3. He states that he wishes this Court to hear his case because he believes he will not "see bias" in federal court "like I saw in others." Id. Plaintiff states that he "also put in a Notice of Removal in the Federal Court for those criminal charges that led to the Complaint. I do not trust the assigned appellate attorney. That case too has

Case 5:26-cv-00698-MAD-MJK Document 5 Filed 04/21/26 Page 67 of 72

Cole v. Smrtic, Not Reported in Fed. Supp. (2024)
2024 WL 4870495

Constitutional violations. That case number is 1:24-CR-301 (AMN)." Id.

5    Plaintiff did not provide any transcripts.

### C. Discussion [6]

6    As a courtesy, the Court has provided plaintiff with copies of any unpublished cases cited within this Report-Recommendation & Order.

### 1. Rule 8

As a threshold issue, plaintiff's complaint fails to meet the requirements of Rule 8. See FED. R. CIV. P. 8(a)(2). He does not provide a short and plain statement of the claim demonstrating why he is entitled to relief. Although he makes general references to both an Article 78 proceeding and a criminal proceeding and unexplained references to "Due Process, 30.30 Speedy Trial Violation, Ineffective of Counsel," he does not provide factual support or context. Thus, his complaint does not provide "fair notice" to defendants of the claims against them. See FED. R. CIV. P. 8(a)(2).

### 2. Heck v. Humphrey

However, there are several substantive concerns that further lead the undersigned to recommend dismissal. First, in referencing to "Due Process, 30.30 Speedy Trial Violation, Ineffective of Counsel" and explicitly referencing a criminal conviction, it is clear that plaintiff is attempting to seek some kind of review of a criminal proceeding or conviction. See Compl. at 3. Plaintiff also accuses all named judges of denying him due process and contends that an unnamed "ADA/Special Prosecutor withheld potential exculpatory material which was usd [sic] against me." Compl. at 4. Plaintiff also references a conviction. See Dkt. No. 7 at 4. Such claims would be barred by Heck v. Humphrey.

 **\*5**  As this Court, citing the District of Connecticut, has set forth:

In Heck, the Supreme Court held that in order for a plaintiff "to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by

actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 486-87. The court further held that "[a] claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983." Id. at 487 (emphasis in original).

[ ]

Thus, under Heck and its progeny, if a conviction has not been invalidated previously, a "§ 1983 action is barred ... no matter the target of the prisoner's suit ... if success in that action would necessarily demonstrate the invalidity of confinement or its duration." Wilkinson v. Dotson, 544 U.S. 74, 81-82 (2005) (emphasis in original).

Ali v. Shattuck, No. 8:24-CV-0128 (DNH/CFH), 2024 WL 2747619, at \*3 (N.D.N.Y. May 29, 2024), report-recommendation adopted sub nom. Ali v. Dow, No. 8:24-CV-128, 2024 WL 3460745 (N.D.N.Y. July 18, 2024) (quoting Zografidis v. Richards, No. 3:22-CV-00631 (AVC), 2022 WL 21756775, at \*7 (D. Conn. July 6, 2022), report and recommendation adopted (Oct. 7, 2022), aff'd, No. 22-3197, 2023 WL 7538211 (2d Cir. Nov. 14, 2023)).

Plaintiff has failed to demonstrate that any criminal charge(s), conviction, or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Zografidis, 2022 WL 21756775, at \*7. Although plaintiff's complaint wants for detail, the undersigned can clearly determine that plaintiff seeks review of his criminal proceedings, conviction, and/or sentence. The claims plaintiff seeks to pursue relate to allegations that he was denied due process, denied speedy trial rights, and experienced ineffective assistance of counsel. Accordingly, plaintiff's claims are barred by Heck unless and until he can demonstrate favorable termination of his criminal conviction. [7]

7    The undersigned recognizes that claims that are determined to be barred by Heck are dismissed without prejudice. However, the undersigned has recommended dismissal with prejudice because

plaintiff has only named defendants who are immune from relief. Accordingly, the undersigned is recommending dismissal of the claims based on these immunities, rather than a <u>Heck</u> dismissal. The undersigned has included the <u>Heck</u> review for sake of completeness.

### 3. Immunities

Plaintiff names as defendants several defendants who are immune from suit. Insofar as plaintiff names Hon. Michael W. Smrtic, Interim Montgomery County Judge and Tatiana N. Coffinger, "County/Family/Surrogate's Court Judge"[8] such claims would be barred by judicial immunity.

[8]  Although plaintiff provides no facts regarding any family court proceedings, that he named a family court judge and makes general reference to that he seeks review over actions taken by a family court judge. Even if plaintiff were to amend his complaint to provide facts about any possible family court proceedings and details about any alleged violations of his rights that he believes he faced in that Court, if plaintiff seeks this Court's review of an order of the family court, such review would be barred by <u>Rooker-Feldman</u>, and if plaintiff seeks this Court's review or intervention of a currently pending/ongoing Family Court proceeding, such review would be barred by <u>Younger</u>. See <u>Porter v. Nasci, No. 5:24-CV-0033 (GTS/TWD), 2024 WL 1142144, at *4 (N.D.N.Y. Mar. 15, 2024)</u> (citations omitted), <u>report</u> <u>and</u> <u>recommendation</u> <u>adopted</u>, <u>2024 WL 3158645 (N.D.N.Y. June 25, 2024)</u> ("Under the <u>Rooker-Feldman</u> doctrine, a federal district court lacks authority to review a final state court order or judgment where a litigant seeks relief that invites the federal district court to reject or overturn such a final state court order or judgment."); <u>see</u> <u>also</u> <u>Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir. 2002)</u> ("[F]ederal courts [must] abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings.").

**\*6** "With minor exceptions, judges are entitled to absolute immunity for actions relating to the exercise of their judicial functions." <u>Zavalidroga v. Girouard, No. 6:17-CV-682 (BKS/ATB), 2017 WL 8777370, at *8 (N.D.N.Y. July 7, 2017)</u>

(citing <u>Mireles v. Waco, 502 U.S. 9, 9-10 (1991)</u> (per curiam)). "Judicial immunity has been created for the public interest in having judges who are 'at liberty to exercise their functions with independence and without fear of consequences.' " <u>Id.</u> (quoting <u>Huminski v. Corsones, 396 F.3d 53, 74 (2d Cir. 2004)</u>). "Judicial immunity applies even when the judge is accused of acting maliciously or corruptly." <u>Id.</u> (citation omitted); <u>see</u> <u>Positano v. New York, No. 12-CV-2288 (ADS/AKT), 2013 WL 880329, at *4 (E.D.N.Y. Mar. 7, 2013)</u> (explaining that the plaintiff may not bring action against a judge for actions taken in his judicial capacity, even when the actions violated the ADA).

"Judicial immunity is immunity from suit, not just immunity from the assessment of damages." <u>Zavalidroga, 2017 WL 8777370, at *8</u> (citing <u>Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)</u>). "The only two circumstances in which judicial immunity does not apply is when he or she takes action 'outside' his or her judicial capacity and when the judge takes action that, although judicial in nature, is taken 'in absence of jurisdiction.' " <u>Id.</u> (quoting <u>Mireles, 502 U.S. at 11-12</u>). "In determining whether or not a judge acted in the clear absence of all jurisdiction, the judge's jurisdiction is 'to be construed broadly, and the asserted immunity will only be overcome when the judge clearly lacks jurisdiction over the subject matter.' " <u>Pacherille v. Burns, 30 F. Supp. 3d 159, 163 (N.D.N.Y. 2014)</u> (quoting <u>Ceparano v. Southampton Just. Ct., 404 F. App'x 537, 539 (2d Cir. 2011)</u> (summary order)). "Whether a judge acted in a judicial capacity depends on the nature of the act [complained of] itself, i.e., whether it is a function normally performed by a judge, and [on] the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." <u>Ceparano, 404 F. App'x at 539</u> (internal quotation marks and citation omitted). "Further, if the judge is performing in his judicial capacity," he " 'will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction.' " <u>Ceparano, 404 F. App'x at 539</u> (quoting <u>Stump v. Sparkman, 435 U.S. 349, 362 (1978)</u>). "Judges are not, however, absolutely 'immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity.' " <u>Bliven v. Hunt, 579 F.3d 204, 209 (2d Cir. 2009)</u> (quoting <u>Mireles, 502 U.S. at 11</u>).

Thus, as plaintiff names the judicial defendants in relation to actions or omissions that they took in their roles as judges, their actions are protected by absolute judicial immunity. To the extent plaintiff names Hon. Felix Catena, "Retired

Case 5:26-cv-00698-MAD-MJK Document 5 Filed 04/21/26 Page 69 of 72

Administrative Law Judge," Judge Catena is also protected by absolute judicial immunity as a judge's retirement, "does not impact [his or] her immunity for acts taken in [his or] her official capacity before her retirement." McCray v. Lewis, No. 16-CV-3855 (WFK/VMS), 2016 WL 4579081, at *2 (E.D.N.Y. Aug. 31, 2016). To the extent plaintiff may seek to sue the judges their official capacities, the suit is barred by the Eleventh Amendment. See Pacherille v. Burns, 30 F. Supp. 3d 159, 163 n.5 (N.D.N.Y. 2014) ("The Eleventh Amendment shields judges from suit to the extent that they are sued in their official capacities.").

**\*7** In addition, plaintiff also references, exclusively in his "relief" section of the form complaint, "the Supreme Court Appellate Division, Third Department" when stating that he experienced "deliberate misconduct and malice." Compl. at 7. He does not name this Court as a defendant anywhere in the complaint. However, even if plaintiff were to have named the Appellate Division, Third Department as a defendant, such defendant would also need to be dismissed based on Eleventh Amendment immunity as the Appellate Division "is merely an agency or arm of New York State." Benyi v. New York, No. 3:20-CV-1463 (DNH/ML), 2021 WL 1406649, at *5 (N.D.N.Y. Mar. 23, 2021), report and recommendation adopted, No. 3:20-CV-1463, 2021 WL 1404555 (N.D.N.Y. Apr. 13, 2021) (citation omitted). Accordingly, to the extent a liberal reading of the complaint may suggest that plaintiff seeks to name the Appellate Division as a defendant, such claims are barred by Eleventh Amendment immunity. See Compl.

Finally, insofar as plaintiff seeks to sue Prosecutor Samuel V. Maxwell, Esq., Assistant District Attorney, in addition to the Heck issues noted above, he would be protected by absolute prosecutorial immunity. As this Court has recently reiterated,

> Prosecutors enjoy "absolute immunity from § 1983 liability for those prosecutorial activities 'intimately associated with the judicial phase of the criminal process.'" Barr v. Abrams, 810 F.2d 358, 360-61 (2d Cir. 1987) (citing Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). This immunity encompasses "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." Hill v. City of New York, 45 F.3d 653, 661 (2d Cir. 1995) (internal quotations and citation omitted). Absolute immunity applies when a prosecutor's conduct, acting as an advocate during the judicial phase of the criminal process, "involves the exercise of discretion." Flagler v. Trainor, 663 F.3d 543, 547 (2d Cir. 2011) (citing Kalina v. Fletcher, 522 U.S. 118, 127 (1997)).

Accordingly, absolute immunity extends to functions such as "deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas." Simon v. City of New York, 727 F.3d 167, 171 (2d Cir. 2013) (citing Imbler, 424 U.S. at 431 n.33); see also Flagler, 663 F.3d at 547 (explaining, "the Supreme Court has found prosecutors absolutely immune from suit for alleged misconduct during a probable cause hearing, in initiating a prosecution, and in presenting the State's case ... [but] withheld absolute immunity for conduct unrelated to advocacy, such as giving legal advice, holding a press conference, or acting as a complaining witness."). "[O]nce a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused ...." Bernard v. Cnty. of Suffolk, 356 F.3d 495, 503 (2d Cir. 2004) (citing Cleavinger v. Saxner, 474 U.S. 193, 199-200 (1985)).

Williams v. Atkins, No. 5:24-CV-0573 (DNH/TWD), 2024 WL 3649849, at *5 (N.D.N.Y. June 11, 2024), report and recommendation adopted, No. 5:24-CV-573, 2024 WL 3548760 (N.D.N.Y. July 26, 2024).

Plaintiff appears to suggest that Mr. Maxwell "withheld potentially exculpatory material" that was used against him. Compl. at 4. Beyond the Heck barriers already discussed, even if plaintiff could amend to provide greater detail, absolute immunity would extent to even this alleged misconduct as such allegations clearly fall within the scope of prosecutorial immunity. Accordingly, it is recommended that any claims against ADA Samuel V. Maxwell be dismissed for absolute prosecutorial immunity. "Furthermore, because the District Attorney's prosecutorial immunity is substantive and not something that can be corrected by a better pleading, I recommend that the dismissal be with prejudice." Phillips v. New York, No. 5:13-CV-927, 2013 WL 5703629, at *5 (N.D.N.Y. Oct. 17, 2013) (quoting Cuoco v. Moritsugu, 222 F.3d 99, 223 (2d Cir. 2000)). [9]

[9]     Plaintiff appears to characterize his submissions as a purported removal to federal court or suggests that he seeks to remove his case from Montgomery County Court to this Court. See Dkt. No. 7 (citing 28 U.S.C. § 1441). However, in addition

to the infirmities mentioned above, plaintiff has not demonstrated that any proceeding related to this complaint has been properly removed to, or is subject to removal to, this Court. See, e.g., 28 U.S.C. § 1446. Indeed, plaintiff's submissions appear to indicate that plaintiff is the plaintiff in the County Court action. See id. § 1446(a).

### III. Conclusion

**\*8** It is **ORDERED**, that plaintiff's in forma pauperis application (dkt. no. 2) be **GRANTED**; and it is

**RECOMMENDED**, that plaintiff's section 1983 claims against Honorable Michael W. Smrtic; Tatiana N. Coffinger, County/Family/Surrogate's Court Judge; and Felix Catena, Retired Administrative Law Judge (Dkt. Nos. 1, 7) be **DISMISSED WITH PREJUDICE** as follows: (1) claims brought against them in their personal/individual capacities for judicial immunity, and (2) claims brought against them in their official capacities for Eleventh Amendment immunity; and it is further

**RECOMMENDED**, that plaintiff's section 1983 claims against Assistant District Attorney Samuel V. Maxwell (Dkt. Nos. 1, 7) be **DISMISSED WITH PREJUDICE** due to absolute prosecutorial immunity; and it is further

**RECOMMENDED**, that, to the extent a liberal reading of the complaint may suggest that plaintiff seeks to name the Appellate Division, Third Department, as a defendant (Dkt. Nos. 1, 7), such claims be **DISMISSED WITH PREJUDICE** as barred by Eleventh Amendment immunity, and it is

**RECOMMENDED**, that plaintiff's pro se motion for permission to file electronically (dkt. no. 4) and motion to appoint counsel [10] (dkt. no. 5) be **DISMISSED AS MOOT** based on the above recommendations, and it is

[10]    The undersigned also notes that plaintiff did not contend that he made any efforts to obtain counsel on his own, show proof of any attorneys he contacted. See Terminate Control Corp v. Horowitz, 28 F.3d 1335 (2d Cir. 1994). See Dkt. No. 5.

**ORDERED**, that the Clerk serve this Report-Recommendation & Order on plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), parties have **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 72. [11]

[11]    If you are proceeding pro se and are served with this Report-Recommendation and Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4870495

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:24-CV-00847**<br>Cole v. Smrtic et al | — | N.D.N.Y. | July 08, 2024 | Docket |

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

1. Cole v. Smrtic
2024 WL 4870495 , N.D.N.Y. , Nov. 21, 2024

*Report and Recommendation Adopted by*

2. Cole v. Smrtic
2025 WL 247901 , N.D.N.Y. , Jan. 21, 2025

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.